**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

Happy Hour Thinking, LLC,            §
                                     §
          Plaintiff,                 §
                                     §
v.                                   §    CIVIL ACTION NO. _____
                                     §
Evriholder Products, LLC,            §    **JURY TRIAL DEMANDED**
                                     §
          Defendant.                 §
                                     §
_____      §
                                     §

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Happy Hour Thinking, LLC. ("HHT") for its Complaint with Jury Demand for patent infringement against defendant, Evriholder Products, LLC. ("Evriholder"), alleges based on information and belief, as follows:

**THE PARTIES**

1.      Plaintiff HHT is a Utah limited liability corporation, with its corporate office in West Jordan, Utah.

2.      On Information and belief, Defendant Evriholder is an Indiana corporation having a principal place of business in Brea, California.

**NATURE OF THE ACTION**

3.      This is a civil action for infringement of the United States Patent No. 11,820,626 (the "Asserted Patent"). This action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq*.

**JURISDICTION AND VENUE**

4.      This Court has subject matter jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5.     This Court has personal jurisdiction over Evriholder in this action. First, Evriholder committed acts of infringement in this District. Evriholder, *inter alia*, offered for sale, and continues to offer for sale, its Cord Keeper product – which, as will be provided below, infringes the Asserted Patent – inside the brick-and-mortar stores of Walmart, which is the biggest retail chain in the United States, in this District. In addition, Evriholder placed, and continues to place, its infringing Cord Keeper product into the stream of commerce, with the knowledge and understanding that its Cord Keeper has been purchased and used by vast unwary consumers living in this District, resulting in, as will be provided below, Evriholder having infringed method claims of the Asserted Patent through those same vast consumers living in this District. Accordingly, both acts which Evriholder committed within this District and acts which Evriholder committed through interstate commerce, give rise to this action and have established minimum contacts with this forum such that the exercise of jurisdiction over Evriholder will not offend traditional notions of fair play and substantial justice.

6.     Accordingly, venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 & 1400 (b).

## PLAINTIFF'S ASSERTED PATENT

### i.    *General Allegations About the Asserted Patent*

7.     The Patent-In-Suit, which is the Asserted Patent, is United States Patent No. 11,820.626, entitled "Systems and Methods for Electrical Cord Storage," and was duly and legally issued on November 21, 2023, by the United States Patent and Trademark Office ("USPTO"). A copy of the Asserted Patent is attached hereto as Exhibit 1. Hereinafter, "the Patent-In-Suit" and "the Asserted Patent" may be used interchangeably to refer to the United States Patent No. 11,820.626.

8.     Relatedly, before the Asserted Patent was issued on November 21, 2023, its underlying non-provisional utility patent application – namely, App. Ser. No. 16/868,477 (hereinafter "the Underlying '477 Application" or "the Underlying '477 Utility Patent Application") – was published as United States Patent Application Publication No. US 2020/0354185 (hereinafter "the '185

Publication" or "the '185 Patent Publication") on November 12, 2020. A copy of the '185 Publication is attached hereto as Exhibit 3.

9.      The '185 Publication includes claims which are substantially similar in scope to at least independent claims 1 and 16 of the Asserted Patent.

10.     HHT is the owner of all right, title, and interest of the Asserted Patent.

11.     Each claim of the Asserted Patent is valid and enforceable.

12.     The Asserted Patent is directed to an electrical cord storage device adapted to be affixed to an electrical appliance as well as a method of using the same device. FIGS. 1A and 1B, as provided below, illustrate an exemplary embodiment of the patented device taught in the patent, with FIG. 1A illustrating a device of the exemplary embodiment and FIG. 1B illustrating an exemplary manner in which a device of the exemplary embodiment is used, by being affixed to a surface of an electrical application, to organize and organize an electrical cord thereof.





FIG. 1A                                FIG. 1B

13.     HHT also has had a commercial product, which is a commercial embodiment of the Asserted Patent, promoted and commercialized under the "Cord Wrapper" trademark. FIGS. 2A-F, as provided below, show a commercial "Cord Wrapper" device of HHT, as patented by the Asserted Patent, having been marketed and offered for sale online on, e.g., Amazon.


FIG. 2A


FIG. 2B


FIG. 2C


FIG. 2D

FIG. 2E

FIG. 2F

14.    Hereinafter, the term "the Cord Wrapper" will refer to either a device exemplified and illustrated in the Asserted Patent, as provided in the above-provided FIGS. 1A and 1B, or the product branded "Cord Wrapper," as provided above in FIGS. 2A-F and patented by the Asserted Patent.

### ii.    *Teaching-Away by the Prior Art*

15.    Products had been invented, or otherwise provided, in the niche space of apparatus specifically provided and adapted to store an electrical cord of an electrical appliance in an wound form (a niche space which will hereinafter be simply referred to as "the Niche Space") – which is for the objective of storing the electrical cord of an electrical appliance so that there will not be a significant portion, or otherwise significant length, of the electrical cord remaining hanging off the appliance while the appliance is either being plugged in or unplugged – before the inventing of the Cord Wrapper.

16.    As one example of the prior art, US Patent Application Publication No. 20050006516 to Li (hereinafter "Li"), which claims a priority date of July 2, 2003, discloses such a device in the Niche Space. The main embodiment of Li is shown below collectively through

FIGS. 3A and FIGS. 3B. Hereinafter, a device of the main embodiment of Li is simply referred to as "Li."





FIG. 3A                                                           FIG. 3B

17.    Hereinafter, the term "cord-winding," when used in a context pertaining to any of a configuration, a function, and an operation, may also refer to "cord-unwinding" as pertaining to any of the respective configuration, function, and operation.

18.    As can be readily noted, in providing both the cord-storage and cord-winding functions (which are by definition two distinct functions), Li is fairly convoluted including and involving more than a dozen distinct structures which interface and interconnect with each other. Those distinct structures of Li's include, *inter alia*, front cover unit 33, parabolically shaped base plate 34, rollers 51 and 52, reel member 42, spring member 43, control knob 62, winder 4, pivot pins 512 and 522, pivot holes 331, and through-hole 32 (having first and second sides 321 and 322).

19.    Notably, in providing its intended cord-storage and cord-winding functions, Li entails two *distinct* configurations, namely, its cord-storage configuration (which is formed to store a wound electrical cord of an electrical appliance) and its cord-winding configuration (which is formed to perform winding and unwinding the electrical cord of the electrical appliance).

20.    Li's cord-storage configuration, which is Li's de facto configuration as shown in FIG. 3A, is by definition a practically enclosed configuration when its cover unit 33 – which has a rectangular-shaped side face and is adapted, in combination with parabolic-shaped base plate 34

and other structures, to cover practically the entirety of housing 3 (except for through-hole 32 specifically sized for permitting an extending of the cord portion while keeping the plug portion disposed outside housing 3) – is disposed to cover almost the entirety of Li's housing 3. Notably, in view of the entire disclosure of Li, it should be apparent that Li's de facto cord-storage configuration is practically enclosed in nature for deliberately *precluding* the same configuration from being used for the cord-winding function.

21.     Li's cord-winding configuration, as shown in FIG. 3B, is formed, and can *only* be formed, when Li's otherwise practically enclosed cord-storage configuration is *distinctly modified* with its cover unit 33 being distinctly redisposed to uncover and render wide open its housing 3 so that the cord-winding operation can be performed with its otherwise practically enclosed housing 3 becoming wide open.

22.     Thus, Li, which is structurally convoluted, entails, in providing both the cord-storage and cord-winding functions, *conversions through modifications* between two distinct configurations (namely, its de facto practically enclosed cord-storage configuration and its wide-open cord-winding configuration), with its de facto practically enclosed cord-storage configuration needing to be distinctly modified to be converted to its wide-open cord-winding configuration before the cord-winding operation can be performed, and vice-versa.

23.     Turning to the patented Cord Wrapper, as can also be readily noted, with respect to overall structure, in contrast to Li's being convoluted, the Cord Wrapper is rather simple. In more details, rather than having more than a dozen distinct structures which interface and interconnect with each other, the Cord Wrapper only has three distinct structures, namely, its base, its post, and its dome with scalloped edges, with its post extending between its base (to which its post is affixed at the first end thereof) to its dome with scalloped edges (to which its post is affixed at the second

end thereof) to form a cord-wrapping structure adapted to receive an electrical cord of the electrical appliance wound thereon and to prevent or reduce unintended unwinding of the wound electrical cord therefrom).

24.    That is, the Cord Wrapper is adapted to provide both the cord-storage function and the cord-winding function. In that regard, in contrast to Li which entails conversions through modifications between two distinct configurations (in its de facto practically enclosed cord-storage configuration and its wide-open cord-winding configuration), the Cord Wrapper only entails a *single* permanent configuration, as formed with a base, a post and a dome (having scalloped edges configured to prevent or reduce unintended unwinding of electrical cord wounded on the post) being distinctly and uniquely combined and configured to provide both the cord-storage and cord-winding functions.

25.    For the Cord Wrapper, its single permanent configuration is, *inter alia*, configured, in relation to a surface of an electrical appliance, to form an *open space* between the combined surface of its base and the appliance surface (after its base, which is adapted to be affixed to the appliance surface, is affixed to the appliance surface to turn the Cord Wrapper an extension of the electrical appliance), with the formed open space adapted for enabling its cord-wrapping structure to receive the electrical cord of the electrical appliance wound thereon and its cord-wrapping structure adapted to prevent or reduce unintended unwinding of the wound electrical cord therefrom.

26.    Thus, the Cord Wrapper, which is structurally simple, is configured to provide both the cord-storage function and the cord-winding function *with one single permanent configuration* configured to form both an cord-wrapping structure and an open space – which is between a combined surface of its base and a surface of an electrical appliance (to which its base is affixed)

and the formed cord-wrapping structure – adapted for enabling the formed cord-wrapping structure to receive the electrical cord of the electrical appliance wound thereon, with the cord-wrapping structure adapted to prevent or reduce unintended unwinding of the wound electrical cord therefrom.

27.    Accordingly, the Cord Wrapper is distinct from Li at least in the aspect with respect to providing both the cord-storage and cord-winding functions. Namely, in contrast to Li's entailing *conversions through modifications* between two distinct configurations (namely, Li's de facto practically enclosed cord-storage configuration and Li's wide-open cord-winding configuration), the Cord Wrapper entails a *single permanent* configuration without any need for conversions through modifications between or among multiple distinct configurations. On the other hand, the Cord Wrapper's single permanent configuration, in providing both the cord-storage and cord-winding function, has a base adapted to be affixed to a surface of an electrical appliance and is configured to form both a cord-wrapping structure and an open space – which, after the base is affixed to the surface of the electrical appliance to form a combined surface, is between the combined surface and the formed cord-wrapping structure – adapted for enabling the formed cord-wrapping structure to receive the electrical cord of the electrical appliance wound thereon, with the cord-wrapping structure adapted to prevent or reduce unintended unwinding of the wound electrical cord therefrom.

28.    As another example of the prior art, US Patent No. 5,779,175 to Shirahase (hereinafter "Shirahase"), which was issued on July 14, 1998, discloses such another device in the Niche Space. The main embodiment of Shirahase is shown below collectively through FIGS. 4A-C.  Hereinafter, a device of the main embodiment of Shirahase will simply be referred to as "Shirahase."



FIG. 4A

FIG. 4B

FIG. 4C

FIG. 5

FIG. 6

FIG. 7

29.    As can be readily noted, in providing both the cord-storage and cord-winding functions, Shirahase is, as similar to Li, also quite convoluted structure-wise, with its voluminous numbers of structures interfacing and interconnecting with each other.

30.    Critically, similar to Li while in contradistinction to the Cord Wrapper, in providing its intended cord-storage and cord-winding functions, Shirahase also entails two *distinct* configurations, namely, its cord-storage and cord-winding configurations.

31.    Shirahase's cord-storage configuration, which is its de facto configuration as shown in FIG. 4A, is, similar to Li's cord-storage configuration, also by definition a practically enclosed configuration, with its only notable openings being a pair of relative narrow inlets/outlets 31 sized and adapted to form an internal narrow and elongated cording slot 13 through which the electrical cord of an electrical appliance can be withdrawn from Shirahase's cord-winding structures

enclosed inside its de facto cord-storage configuration. Notably, in view of the entire disclosure of Shirahase, it should also be apparent that, as is similar to Li's de facto cord-storage configuration, Shirahase's de facto cord-storage configuration is likewise practically enclosed in nature for *deliberately precluding* the same configuration from being used for the cord-winding function.

32.    Shirahase's cord-winding configuration, as shown in FIG. 4C, is, similar to Li's cord-winding configuration, also formed and can *only* be formed when Shirahase's otherwise practically enclosed de facto cord-storage configuration is *distinctly modified* with its second constraint plate 12 being separated (through rotation) from its first constraint plate 11 so that its otherwise practically enclosed cord-winding structures becomes wide open for rendering the cord-winding operable.

33.    Thus, similar to Li, Shirahase also entails, in providing both the cord-storage and cord-winding functions, *conversions through modifications* between two distinct configurations (namely, its de facto practically enclosed cord-storage configuration and its wide-open cord-winding configuration), with its de facto practically enclosed cord-storage configuration needing to be distinctly modified to be converted to its wide-open cord-winding configuration before the cord-winding operation can be performed, and vice-versa.

34.    Accordingly, the Cord Wrapper is distinct from Shirahase at least in the same aspect (with respect to providing both the cord-storage and cord-winding functions) as the Cord Wrapper is distinct from Li.

35.    As still another example of the prior art, US Patent No. 8,091,820 to Thorn (hereinafter "Thorn"), which was issued on January 10, 2012, discloses still such another device in the Niche Space. The main embodiment of Thorn is shown below collectively through FIGS. 5A-D.  Hereinafter, a device of the main embodiment of Thorn is simply referred to as "Thorn."



FIG. 5A    FIG. 5B    FIG. 5C

36.    Thorn is in fact the single primary reference considered during the prosecution of the Asserted Patent before the United States Patent and Trademark Office ("USPTO'). The Examiner, upon having considered Thorn in relation to the claims under prosecution (which later became the issued claims after the Asserted Patent was issued) in view of the argument presented by the prosecuting patent attorney, decided that the claims are patentable over Thorn.

37.    As can be readily noted, in providing both the cord-storage and cord-winding functions, Thorn is, similar to both Li and Shirahase, also quite convoluted structure-wise, with its voluminous numbers of structures interfacing and interconnecting with each other.

38.    Critically, similar to both Li and Shirahase while in contradistinction to the Cord Wrapper, in providing its intended cord-storage and cord-winding functions, Thorn likewise entails two *distinct* configurations, namely, its cord-storage and cord-winding configurations.

39.    Thorn's cord-storage configuration, which is its de facto configuration as shown in FIGS. 5A-B, is, similar to the respective cord-storage configurations of Li and Shirahase, also by definition a practically enclosed configuration, with its only notable openings being one or more

pairs of relatively small mouths 128 of one or more channel 118s each of which is sized to allow a cable to be positioned therein and withdrawn therefrom. Notably, in view of the entire disclosure of Thorn, it should also be apparent, as is similar to the respective de facto cord-storage configurations of both Li and Shirahase, Thorn's de facto cord-storage configuration is likewise practically enclosed in nature for *deliberating precluding* the same configuration from being used for the cord-winding function.

40.     Thorn's cord-winding configuration, as shown in FIG. 5C, is, similar to the respective cord-winding configurations of Li and Shirahase, also formed and can *only* be formed when Thorn's otherwise practically enclosed de facto cord-storage configuration is *distinctly modified* with the outer edge 186 of its cover 104 (which is secured to cap 106 to form its dome) being lifted vertically until its dome (formed collectively by cover 104 and cap 106) is upwardly inverted so that its enclosed cord-winding structures becomes wide open for rendering the cord-winding operable.

41.     Thus, similar to both Li and Shirahase, likewise entails, in providing both the cord-storage and cord-winding functions, *conversions through modifications* between two distinct configurations (namely, its de facto practically enclosed cord-storage configuration and its fully exposed cord-winding configuration), with its de facto practically enclosed cord-storage configuration needing to be distinctly modified to be converted to its wide open cord-winding configuration before the cord-winding operation can be performed, and vice-versa.

42.     Accordingly, the Cord Wrapper is distinct from Thorn at least in the same aspect (with respect to providing both the cord-storage and cord-winding functions) as the Cord Wrapper is distinct from both Li and Shirahase.

43.    To summarize, in the same aspect with respect to providing both the cord-storage and cord-winding functions, as for the prior art of the patented Cord Wrapper, each of Li, Shirahase and Thorn invariably entails *conversions through modifications* between the respective de facto practically enclosed cord-storage configuration and the respective wide-open cord-winding configuration, with the respective de facto practically enclosed cord-storage configuration needing to be distinctly modified to be converted to its respective wide-open cord-winding configuration before the cord-winding operation can be performed, and vice-versa.

44.    By contrast, the Cord Wrapper entails a *single permanent* configuration without any need for any conversion through modifications between or among multiple distinct configurations. On the other hand, the Cord Wrapper's single permanent configuration, in providing both the cord-storage and cord-winding function, has a base adapted to be affixed to a surface of an electrical appliance, and is configured to form both a cord-wrapping structure and an open space – which, after the base is affixed to the surface of the electrical appliance to form a combined surface, is between the combined surface and the formed cord-wrapping structure – adapted for enabling the formed cord-wrapping structure to receive the electrical cord of the electrical appliance wound thereon, with the cord-wrapping structure adapted to prevent or reduce unintended unwinding of the wound electrical cord therefrom.

45.    Accordingly, not only the Cord Wrapper is distinct from all three of Li, Shirahase and Thorn at least in the same aspect with respect to providing both the cord-storage and cord-winding functions, but there should be no mistake whatsoever that all three of Li, Shirahase and Thorn, which collectively and largely indicate and reflect the conventional wisdom of the prior art in the Niche Space, invariably *teach away* from the patented Cord Wrapper at least in this same aspect.

46.     This is not to mention other apparent distinctions between the Cord Wrapper and all three of Li, Shirahase and Thorn.

47.     As one example of distinctions, as can be readily noted, the Cord Wrapper is structurally simple whereas in contrast all three of Li, Shirahase and Thorn are structurally convoluted. This should be of no surprise. All three of Li, Shirahase and Thorn were apparently *designed* under the same invariable paradigm, which is to require and rely on *conversions through modifications* to provide two *distinct* configurations (which in this case are each product's respective distinct cord-storage and cord-winding configurations) for operating the two distinct functions, namely, the cord-storage and cord-winding functions.

48.     For each of Li, Shirahase and Thorn (as a respective product), this invariable design paradigm, however, requires that not only two distinct configurations be selectively formed with the respective device, but specific mechanisms used to effectuate conversions with modifications between the two distinct configurations be also provided within the respective device. Thus, with this invariable design paradigm, which was the apparent conventional wisdom of the prior art, it was inevitable that all three of Li, Shirahase and Thorn (as respective products) are structurally convoluted (albeit in respectively different manners, forms and shapes).

49.     As another example of distinctions, the Cord Wrapper's *single permanent* configuration is adaptively open (for *enabling* the cord-winding function) in nature whereas by contrast the respective de facto configurations of all three of Li, Shirahase and Thorn, all of which are respective cord-storage configurations, are practically enclosed (for *deliberately precluding* the cord-winding function) in nature. This apparent distinction also unmistakably demonstrates that the prior art teaches away from the Cord Wrapper.

50.    As still another example of distinctions, the Cord Wrapper comprises a dome specifically provided with scalloped edges whereas *none* of the three of Li, Shirahase and Thorn needs or has any reason to have (primarily due to their respective de facto practically enclosed cord-storage configurations) and therefore has a similar or corresponding component specifically provided with scalloped edges.

51.    Thus, it is quite evident that the prior art as a whole, which unmistakably indicates and demonstrates the conventional wisdom percolating in the prior art, invariably teaches away from the Cord Wrapper. Accordingly, the patentability of the Cord Wrapper should be apparent in view of the prior art.

52.    Further, the patentability, particularly the non-obviousness, of the Cord Wrapper is also dispositively supported by overwhelming evidence of well-known secondary considerations, such as commercial success, failure of others, accolades by others, and overwhelming copying by others, as will be provided and detailed below.

*iii.*    *HHT's Groundbreaking Innovation In the Cord Wrapper as Indicative of Failure of Others*

53.    The journey of the inventing and developing of the Cord Wrapper patented by the Asserted Patent started in April 2019 in a spring evening when the three named inventors (hereinafter "the TCW Inventors") of the Asserted Patent were gathered together chatting while enjoying the beautiful evening. As one of them was putting away a toaster (that had been used earlier) in a cabinet, the door of the cabinet refused to close because the dangling toaster cord was jamming the door. They were told that this was a regular occurrence by a friend of theirs.

54.    Initially, they were looking for solutions in retail brick-and-mortar stores and online marketplaces, assuming there must have been tons of available options which solve or otherwise address this dangling-appliance-cord problem. To their surprise, not only were there only very

limited number of options available in retail brick-and-mortar stores and online marketplaces, but none of those very limited number of options actually solved or otherwise addressed this problem in a manner which they wished for, a manner (hereinafter "a TCW Inventors' Wishful Manner") which is *simple and effective in terms of turning a device into an permanent extension of an electrical appliance and thereafter leveraging that device to both wind an otherwise dangling cord of the electrical appliance and store the wound cord*. In fact, even as of this day, they still recall those limited number of options (which they noted back in April 2019), which include 3M Cord Bundlers (listed immediately below in FIG. 5E using a recently screen-snapped picture), twist ties, zip ties, and so on, and none of which actually solved or otherwise addressed this dangling-appliance-cord problem in a TCW Inventors' Wishful Manner.



FIG. 5E

55.     The realization of the TCW Inventors, with regard to the harsh marketplace reality of April 2019 – namely, *having very limited number of options (available in the stores and marketplaces) which solve or otherwise address this dangling-appliance-cord problem in a TCW Inventors' Wishful Manner* – on one hand not only confirms, but underscores, what have been noted above in connection with the prior art references Li, Shirahase and Thorn. Namely, none of Li, Shirahase and Thorn – all of Li, Shirahase and Thorn are evidently convoluted structure-wise

and *invariably* require, in providing both cord-storage and cord-winding functions, burdensome conversions with modifications between their respective two distinct configurations (namely, their respective de facto practically enclosed cord-storage configurations and wide-open cord-winding configurations) – solve or otherwise address this dangling-appliance-cord problem in a TCW Inventors' Wishful Manner. This in turn explains why none of the three prior art references, in terms of their respective commercial embodiments if there had been any, had gained enough traction and popularity in marketplaces as of April 2019.

56.    The realization of TCW Inventors, with regard to the harsh marketplace reality of April 2019, is indicative of failure of others as least as of April 2019 with respect to having a solution to *solve or otherwise address this dangling-appliance-cord problem in a TCW Inventors' Wishful Manner*.

57.    Recognizing that harsh reality, the TCW Inventors first conceived their own innovative ideas and then worked hard for the next 12 months, developing, testing and re-testing various prototyped solutions, which were consummated with, *inter alia*, the Cord Wrapper being officially launched in March 2020.

58.    The March 2020 launch of the Cord Wrapper instantly provided an innovative, refreshing and unique solution to the Niche Space. The Cord Wrapper is *effective* in enabling and facilitating a user to do things expected from prior art cording devices such as Li, Shirahase and Thorn – things such as turning an excessively long and dangling a cord of an electrical appliance to a configuration with most of the cord's length being in a compactly wound form, and providing a storage for the wound cord – while not only entailing a *single permanent* configuration that is radically and qualitatively simpler than configurations which the aforementioned prior art devices (in the Niche Space) respectively entail but requiring no conversions with modifications between

or among multiple distinct configurations in providing both the cord-storage and cord-winding functions.

59.     In fact, around the time when the Cord Wrapper was launched, one of the TCW Inventors (hereinafter "Co-Inventor A"), upon taking notice of the then state of the Niche Space, proudly declared that the Cord Wrapper was so groundbreaking and unique that the Cord Wrapper had started an entire industry (in the Niche Space).  Co-Inventor A was referring to the fact that the Cord Wrapper pioneered and proved a then brand-new paradigm of realizing the objective of storing an electrical cord of an electrical appliance in a wound form through using a separate device (separate from an electrical appliance) of a *single permanent config*uration to provide both the cord-storage and cord-winding functions after using a coupling means (which may or may not come with the separate device) to turn the separate device into an extension of the electrical appliance. And in providing both the cord-storage and cord-winding functions, this *single permanent* configuration has a base adapted to be affixed to a surface of an electrical appliance and configured to form both a cord-wrapping structure and an open space – which, after the base is affixed to the surface of the electrical appliance to form a combined surface, is between  the combined surface and the cord-wrapper structure - adapted for enabling the formed cord-wrapping structure to receive and electrical cord of the electrical appliance wound thereon, with the cord-wrapping structure adapted to prevent or reduce unintended unwinding of the wound electrical cord therefrom.

60.     The prior art paradigm of providing both the cord-storage and cord-winding functions with a separate device (from an electrical appliance) is, as demonstrated above, in fact the opposite of this then brand-new paradigm, resulting in, *inter alia*, prior art devices having been invariably radically and qualitatively convoluted structure-wise and requiring burdensome

conversions with modifications between or among multiple distinct configurations in providing both the cord-storage and cord-winding functions, which is in contrast to the Cord Wrapper being simple structure-wise while only entailing *one single permanent* configuration, without any need to entail conversions with modifications between or among multiple distinct configurations, in providing both the cord-storage and cord-winding functions.

61.    Accordingly, Co-Inventor A's proud declaration that the Cord Wrappers started a brand-new industry (in the Niche Space) was genuinely indicative of how groundbreaking and unique the patented Cord Wrapper was when it was invented and launched, which in turn is indicative of failure of others as of April 2019 with respect to having a solution to *solve or otherwise address this dangling-appliance-cord problem in a TCW Inventors' Wishful Manner*.

    *iv.*   *Praises and Recognitions Accorded by the Consumer Product Industry*

62.    Since the Cord Wrapper's March 2020 launch, it did not take long for the consumer product industry to take notice of, embrace, praise, and recognize this groundbreaking and unique solution (in the Cord Wrapper) to consumer-perceived deficiencies (i.e. problems) entailed by other options available in the Niche Space.

63.    In 2021, which was less than two years after the March 2020 launch of the Cord Wrapper, the Cord Wrapper received the Kitchen Gear of the Year Award of the same year from the Good Housekeeping[1], which is an iconic media platform that has maintained a significant presence in the lifestyle and consumer advocacy space for over a century.

64.    Between 2022 and 2023, QVC (which stands for "Quality Value Convenience"), which has been an iconic nationally syndicated home shopping network with a daily audience of millions and a reputation for curating innovative, problem-solving consumer products, selected the

---

[1] The Cord Wrapper's receiving of this award is provided on
https://www.goodhousekeeping.com/cooking-tools/a38202680/kitchen-gear-awards-2021.

Cord Wrapper twice[2] to be the featured product of its "single-product" shows (produced for airings) each lasted between five (5) and nine (9) minutes. The two "single-product" shows (featuring the Cord Wrapper) were aired seven (7) times collectively since they were produced. Provided immediately below in FIG. 5F is a screenshot taken from one of the two aired QVC "single-product" shows, which demonstrates how QVC featured the Cord Wrapper in the show.



FIG. 5F

65.     As well known, QVC's product selection process has always been highly competitive dating back way before 2020, with thousands of products being submitted annually but only a small percentage thereof being approved for its broadcasts. The Cord Wrapper was thus selected from among thousands of kitchen and home organization products to appear, for a "single-product" show, not once, but twice, reflecting, for the Cord Wrapper, *the ultimate recognition and accolades* accorded by the entire industry of kitchen and home organization products as to, *inter*

---

[2] Videos of the two aired QVC "single product" shows can be watched via the following links:
https://www.youtube.com/watch?v=IKp0kWalC-o.
https://www.youtube.com/watch?v=hsdg3S4mLbQ.

*alia*, its groundbreaking and unique natures, as well as its strong consumer appeal ( apparently resulted therefrom).

66.    In addition to its success on QVC, the Cord Wrapper was featured twice on ABC's Good Morning America[3] and once on the nationally syndicated Tamron Hall Show in 2022 and 2023. Provided immediately below in FIG. 5G is a screenshot taken from one of the two ABC airings, which demonstrates how the Cord Wrapper was featured in a segment of that airing.



FIG. 5G

67.    It is worth noting that these national platforms (namely, the QVC, ABC's GMA, and the Tamron Hall Show) have been known for being highly selective and featuring innovative, consumer-focused, and impulse-driven products. In fact, upon information and belief, the Cord Wrapper is the *only* product in the Niche Space that has ever been featured on these national platforms, indicating and demonstrating the extraordinarily high regard which the consumer product industry accorded to the Cord Wrapper.

---

[3] Video of one of the two GMA airings of the Cord Wrapper can be watched via this link: https://www.goodmorningamerica.com/shop/story/gma3-deals-steals-home-91324865.

68.     Accordingly, the Cord Wrapper's award from Good Housekeeping (as 2021 Kitchen Gear of the Year), its repeated selections (for appearance) by QVC, ABC's Good Morning America, and its appearance on the Tamron Hall Show — all known for featuring only products with demonstrated consumer appeal and significant sales potential — highlights and demonstrates the extraordinarily high praises and recognitions accorded to the Cord Wrapper by the consumer product industry as a groundbreaking and unique solution (in the Niche Space) of immense consumer appeal.

*v.     Commercial Success of the Cord Wrapper*

69.     Before providing details with respect to commercial success of the Cord Wrapper, it should be appreciated that the Cord Wrapper, which offers a groundbreaking and unique solution in the Niche Space, is an impulse-buy product by nature. This is because products in the Niche Space (where the Cord Wrapper is) are known to be bought on impulse of consumers stimulated in a setting (hereinafter "impulse-buy setting") where features of the product (appealing to the consumer) is amplified through contexts surrounding or tailored to the product.

70.     Online marketplaces as a setting is not known to be an impulse-buy setting particularly effective for impulse-buy products, such as the Cord Wrapper. On the other hand, one known impulse-buy setting pertaining to a product in the Niche Space (such as the Cord Wrapper) is inside a brick-and-mortar store of a major retail chain (such as Walmart) known to have a large selection of electrical appliances offered there-inside, where the product, with its labeling showing how the product is used in conjunction with an electrical appliance, sits on an in-store shelf to catch attention of shoppers walking the store aisles.

71.     This inside-a-brick-and-mortar-store setting pertaining to the Cord Wrapper is similar to, e.g., the all-too-familiar "Apple Store" setting (as pertaining to iPhone case products) where a consumer shopping for an iPhone inside a brick-and-mortar Apple Store sees an iPhone

case product (which is also known to be an impulse-buy product) sitting on a shelf inside the Apple Store. As for the inside-a-brick-and-mortar-store "Apple Store" setting (as pertaining to iPhone case products), a likely scenario should be well appreciated where if a consumer finds the iPhone case product appealing (due to, e.g., the case product's particular features which the consumer happens to appreciate and find appealing), the consumer is, while being inside the brick-and-mortar Apple store, expected to buy the iPhone case product on impulse stimulated (upon, e.g., seeing the case product and finding the same appealing), even with the case product being *inelastically priced* at a level markedly higher than the price level at which the same case product is being offered in major online marketplaces. In fact, the price inelasticity of an accessory product, such as the aforementioned iPhone case product, is what makes such an inside-a-brick-and-mortar-store setting desirable for a third-party seller selling an *impulse-buy* accessory product of its own.

72.    Similarly, as for the aforementioned inside-a-brick-and-mortar-store setting pertaining to the Cord Wrapper, a similarly likely scenario should be likewise well-appreciated, where if a consumer appreciates the Cord Wrapper and finds the Cord Wrapper appealing due to the Cord Wrapper's offering of a groundbreaking and unique solution in the Niche Space, the consumer is, while being inside the brick-and-mortar store, expected to buy the Cord Wrapper on impulse stimulated (upon, e.g., seeing, and being drawn by the groundbreaking and unique appeal of, the Cord Wrapper) even when the Cord Wrapper is *inelastically priced* at a level markedly higher than the price level at which the Cord Wrapper is being offered in major online marketplaces. In fact, as will be provided below, that *price inelasticity* (specifically as to the Cord Wrapper) was proven and well demonstrated in another *impulse-buy* setting formed by airings of the two aforementioned QVC "single-product" shows featuring the Cord Wrapper (a setting which is not identical to the aforementioned inside-a-brick-and-mortar setting pertaining to the Cord Wrapper,

but nonetheless similar to the latter in that both of these two types of settings stimulated buying impulse of respective consumers who were present there-within (i.e., by either watching the QVC airings featuring the Cord Wrapper or getting an opportunity to see, and get drawn by the groundbreaking and unique appeal of, the Cord Wrapper offered on the in-store shelves while walking aisles inside a brick-and-mortar store of a major retail chain having a large selection of electrical appliances offered there-inside).

73.     Accordingly, it should be readily appreciated that the Cord Wrapper, being an impulse-buy product that offers a groundbreaking and unique solution in the Niche Space, is, as far as marketplaces are concerned, best suited to be offered in brick-and-mortar stores of major retail chains like Walmart.

74.     The introduction of the Cord Wrapper to the public was, however, not without major roadblocks. Most significantly, the Cord Wrapper – which, as provided above, is best suited to be offered in brick-and-mortar stores of a major retail chain like Walmart – was nonetheless completely shutout of brick-and-mortar stores of a major retail chain like Walmart. This was primarily due to HHT's being a small startup business and the well-known enormous inroad which any business must make before that business can place a product of its own on the shelves of such brick-and-mortar stores.

75.     Despite this mammoth adversity, the introduction of the Cord Wrapper to the public, which was understandably forced to be exclusively through online marketplaces, still proved to have been a commercial success in relation to the Cord Wrapper's relatively newcomer status in the Niche Space.

76.     During an initial 23-month period (hereinafter "the Ante-Massive-Copying Period" or the "AMC Period") since the March 2020 launch of the Cord Wrapper (the period which was

between March 2020 and January 2022), there was relatively free of copycat products in the market, creating a setting which  closely resembles the exclusivity setting (hereinafter "the Patent-System-Intended Exclusivity Setting" or "the PSI Exclusivity Setting") that the US patent system had all along intended since its enactment in 1790.

77.    This 23-month AMC Period can be divided into two consecutive sub-periods, namely, the 19-month AMC Shopify Sub-Period, which was between March 2020 and September 2021, and the 4-month AMC Dual-Store Sub-Period, which was between October 2021 and January 2022, with the dividing timeline being October 1, 2021, which was around the time the Cord Wrapper gained entry to Amazon (as will be further provided below).

78.    Pertaining to the AMC Shopify Sub-Period, around March 2020, HHT launched its own online store (hereinafter "the Shopify TCW Store") dedicated for marketing and offering the Cord Wrapper through the website   http://www.thecordwrapper.com (hereinafter "the TCW Website") empowered and supported by Shopify (which had been known to be an enabler providing a comprehensive suite of tools and features designed for ease of use, scalability, and efficiency, for the purpose of helping and supporting small business owners in selling products online). Shopify was not an aggregate online marketplace like Amazon. It assisted small businesses to market and sell products through facilitating to have their products and online Shopify-empowered stores appear in search results generated by popular search engines such as Google. Thus, since March 2020, with minimum expenditure by HHT on advertising of the Cord Wrapper, the sale of the Cord Wrapper products generated from the Shopify Store has been almost entirely relying on online traffic (directed to the Shopify TCW Store) drawn from search results generated from popular search engines.

79.     During the 19-month AMC Shopify Sub-Period, the Cord Wrapper was priced at a premium level on the Shopify Store at $27.99 for a 2-pack unit (equivalent of $14 per item), a price-setting decision of HHT reflecting the groundbreaking and unique natures of the Cord Wrapper as a solution (in the Niche Space) to consumer-perceived deficiencies.

80.     It should be safe to assume that for those old-timer options (in the Niche Space) listed in FIG. 5E, at least due to inflation, their prices during the AMC Period were below their recent price levels indicted in FIG. 5E. As indicated in FIG. 5E, most of the per-item prices of those old-timer options are *cutthroat* in ranging between $2.00 and $5.00 even as of recently, much less during the AMC period. Thus, the $14 per-item price of the Cord Wrapper listed on the Shopify TCW Store during the AMC Shopify Sub-Period, which was at least 3 times the respective per-item prices of those old-timer options, should be by definition considered a premium price.

81.     During the 19-month AMC Shopify Sub-Period, monthly sales chart between 2020 and 2021, with respect to the sales of the Cord Wrapper products from the Shopify Store, is provided below in FIG. 5I.

| AMC Shopify Sub-Period (19-Month Period) | Column 1 | Column 2 |
|---|---|---|
| Total Sales | $129,850.74 | |
| Avg. per Month | $6,834.25 | |
| Avg. sales price per 2-pack | 27.99 | |
| Avf. Profit Margin per unit | 16.61 | |
| Monthly Breakdown | 2020 | 2021 |
| January | | $6,164.67 |
| February | | $6,117.52 |
| March | $3,173.73 | $6,542.27 |
| April | $4,285.29 | $11,090.37 |
| May | $5,097.96 | $9,426.02 |
| June | $4,873.05 | $7,056.96 |
| July | $4,848.06 | $3,633.49 |
| August | $8,746.50 | $4,248.26 |
| September | $3,673.53 | $5,487.66 |
| October | $3,493.57 | |
| November | $11,320.39 | |
| December | $20,571.44 | |

FIG. 5I

26

82.     As indicated, during the AMC Shopify Sub-Periods, the total sales exceed $129,000 with a monthly average of over $6,800. This commercial success was achieved with a limited marketing budget, lack of exposure, and the introduction of a new niche product.  Most importantly, HHT created a market price, which is, as mentioned above, by definition considered a *premium* price, that attracted buyers while maintaining a significant profit margin for HHT itself.

83.     As noted above, during the AMC Shopify Sub-Period, the online exposure and reach of the Cord Wrapper to potential shoppers was almost entirely reliant on search results generated by search engines and word of mouth, which were relatively limited in nature due to its newcomer status. In the meantime, the Cord Wrapper was deliberately priced at a premium level in being a groundbreaking and *unique* consumer-appealing solution to consumer-perceived deficiencies in the Niche Space. Accordingly, these several factors being considered, the sales achieved by the Cord Wrapper as a single newcomer product not only in the vast spaces of consumer products but in the Niche Space where available options were priced at *cutthroat* levels during the AMC Shopify Sub-Period shall be considered a commercial success in a setting resembling the PSI Exclusivity Setting.

84.     Pertaining to the AMC Dual-Store Sub-Period, since October 2021, in addition to having presence on the Shopify TCW Store, the Cord Wrapper managed to gain entry to, and became listed on, the Amazon online marketplace (hereinafter "Amazon"), with HHT having established its "The Cord Wrapper" store (hereinafter "the Amazon TCW Store") on Amazon. This entry to Amazon gave the Cord Wrapper a major increase in terms of online exposure and reach, translating into a big boost in total online sales for the Cord Wrapper in a marketplace setting resembling the PSI Exclusivity Setting.

85. During the four-month AMC Dual-Store Sub-Period, the data for the combined online sales from both the Amazon and Shopify TCW Stores is provided below in FIG. 5J.

| AMC Dual Store Sub-Period (4-Month Period) | Column 1 | Column 2 |
|---|---|---|
| Total Sales | $114,785.31 | |
| Avg. per Month | $28,696.33 | |
| Avg. sales price per 2-pack | 27.99 | |
| Avf. Profit Margin per unit | 16.61 | |
| | | |
| Monthly Breakdown | 2021 | 2022 |
| | | |
| January | | $36,018.05 |
| October | $8,006.97 | |
| November | $12,280.86 | |
| December | $58,479.43 | |

FIG. 5J

86. As indicated, during that four-month AMC Dual-Store Sub-Period, the average monthly sales, which is entirely online sales, reached $28k, which was, for the Cord Wrapper, a significant increase in monthly sales over that of the immediately preceding 19-month AMC Shopify Sub-Period. In particular, for December 2021, which was the traditional holiday shopping month for the year, the monthly sale reached a stellar $58k, demonstrating that the Cord Wrapper was gaining significant traction among holiday shoppers.

87. On one hand, the significantly expanded online exposure and reach of the Cord Wrapper (to potential shoppers) that naturally came with the entry of the Cord Wrapper into Amazon had been expected. On the other hand, what made this significant increase in monthly sales truly remarkable is that during the same four-month period, the Cord Wrapper remained priced, only that this time in both the Amazon and Shopify TCW Stores, at $27.99 for a two-pack unit, enjoying a healthy profit margin relative to other options in the Niche Space.

88. That is, with respect to the Cord Wrapper, the significant growth in monthly sales was not due to, e.g., an aggressive slashing of pricing (a practice which is usually done by a

consumer products company for the purpose of spurring demands for a certain product) and the accompanying sacrificing of the profit margin of each sale, or excess expenditure on advertising (noting that HHT's expenditure on advertising the Cord Wrapper was relatively minimum during the AMC Dual-Store Sub Period). The significant growth in monthly sales was due to the expected significant increase in online exposure and reach to potential shoppers through the vast base of active online shoppers of Amazon, unmistakably indicating the groundbreaking and *unique* consumer appeal of the Cord Wrapper to vast consumers.

89.    Accordingly, the remarkable sales achieved by the Cord Wrapper – as a groundbreaking and unique solution to consumer-perceived deficiencies entailed by other options available in the Niche Space – during the AMC Dual-Store Sub-Period not only indicates, but underscores, commercial success of the Cord Wrapper in an online marketplace setting resembling the PSI Exclusivity Setting which had been all along intended by the US patent system despite such a setting is not known to be an impulse-stimulating setting particularly effective for impulse-buy products.

90.    Commercial success of the Cord Wrapper is further evidenced and amplified by the success (in terms of generated sales) which the Cord Wrapper achieved through the aforementioned airings of its two QVC "single-product" shows, despite the consideration that all seven (7) airings of the two separately produced QVC single-product shows (featuring the Cord Wrapper) took place in periods after the AMC Period, periods where, as will be further provided below, a massive number of direct copycat products from primarily international sellers flooded major online marketplaces and the selling prices of the Cord Wrapper were severely eroded as a result thereof.

91.    As well-known, products selected by QVC to be featured in its "single-product" shows are usually considered impulse-buy products by QVC. In addition, the sales generated from

airings of those "single-product" shows on QVC is usually almost entirely driven by the impulse of the audience watching the airings (which typically lasts between 5 and 10 minutes). Most importantly (as pertaining to the impulse-buy nature of the Cord Wrapper), QVC's product presentations are not passive listings — they involve professionally produced live or pre-recorded demonstrations that highlight a product's unique utility, consumer benefits, and patented features. These airings reach a broad nationwide audience in real time, often resulting in rapid purchase decisions. Thus, the above-described well-known QVC setting is an *impulse-stimulating* setting similar in nature to that of the aforementioned inside-a-brick-and-mortar-store settings pertaining to *impulse-buy* products like an iPhone case product and the Cord Wrapper.

92.    Besides, due to QVC's unique *impulse-stimulating* nature, the price of the product featured in an "single-product" show usually reflects a premium over the prices of the same product offered in other marketplace platforms (e.g., brick-and-mortar stores and prevailing online marketplaces).

93.    On June 19 2022, the Cord Wrapper was selected by QVC for the very first time and was introduced with a 3-pack configuration priced at $29.96 (noting that, as will be provided below with more details, the prices of the Cord Wrapper offered in its Amazon and Shopify TCW Stores in June 2022 had already been eroded to $19.99 for a 2-pack configuration). This five-and-half-minute segment generated over *$150,000* in sales through airings, which demonstrated both market demand and QVC viewer responsiveness for the Cord Wrapper in an impulse-stimulating setting. This financial performance in fact surpassed, by QVC's standards, typical expectations for first-time airings, which is a testament to the Cord Wrapper's strong *impulse-buy* appeal to consumers.

94.     On December 2023, due to the Cord Wrapper's previous success from its June 19, 2022 QVC debut, QVC invited the Cord Wrapper back for an encore for a holiday airing, this time offering multiple configurations for the Cord Wrapper, including a 2-pack at $22.00 and a 4-pack at $33.00 (noting that, as will be provided below with more details, the pricing of the Cord Wrapper offered in its Amazon and Shopify TCW Stores in December 2023 had already been further eroded to $14.99 for a 2-pack configuration), reflecting a 47% price premium over the Cord Wrapper's then regular prices offered in Amazon and Shopify TCW Stores. This QVC aired segment, despite being an encore, generated over $180,000 in sales through airings, even surpassing the sales generated from the Cord Wrapper's June 2022 QVC debut (which was already considered an above-expectation strong performance) and thus once again confirming and highlighting the Cord Wrapper's strong market traction and consumer appeal in an impulse-stimulating setting as an impulse-buy product.

95.     The Cord Wrapper's aforementioned strong financial performance of QVC airings of its both "single product" shows – which were achieved despite the fact at the times of both QVC airings, the online marketplace setting, in terms of the offering exclusivity for a patented product as all along intended by the US patent system, had already significantly deteriorated by the massive copying (as will be provided below) away from the PSI Exclusivity Setting as all long had been intended by the US patent system – underscores its *impulse-buy* characteristics and its groundbreaking and unique appeal to consumers. Evidently, for QVC airings of its both "single product" shows, customers responded consistently to the Cord Wrapper's unique appeal regardless of changes in pricing and/or configuration.

96.     Accordingly, the Cord Wrapper's financial performance with respect to QVC airings of its both "single-product" shows further evidenced, and is both indicative and *predictive*

of, not only commercial success, but sustainable commercial success, of the Cord Wrapper in another *impulse-stimulating* setting such as the aforementioned inside-a-brick-and-mortar setting (pertaining the Cord Wrapper).

97.     In addition to its success on QVC, the Cord Wrapper was, as provided above, featured twice on Good Morning America's and once on The Tamron Hall Show in 2022 and 2023. These nationally syndicated shows are highly selective, known for featuring innovative, consumer-focused, and impulse-driven products. During these airings, the Cord Wrapper achieved combined sales exceeding $107,000, reinforcing its unique market appeal as well as the commercial success that comes therewith.

98.     To summarize, during the AMC Period (which most resembles the PSI Exclusivity Setting that the US patent system had all long intended), despite the mammoth adversity it faced, including its being completely shut out of brick-and-mortar stores of a major retail chain like Walmart (which provide an *impulse-stimulating* setting where the Cord Wrapper was, as provided above, best suited to be offered as an *impulse-buy* product), the Cord Wrapper still achieved commercial success as demonstrated by its sales performance and enduring premium-pricing in relation to its newcomer status (in the Niche Space), underscoring that its groundbreaking and unique patented features and market differentiation resonate with consumers even under highly competitive and price-pressured conditions. In addition, the Cord Wrapper achieved commercial success in multiple well-known impulse-stimulating settings, confirming and highlighting the Cord Wrapper's groundbreaking and unique consumer appeal as an impulse-buy product.

### vi.    *Massive Direct Copying of the Cord Wrapper*

99.     Given enough time, an innovative product offering groundbreaking and unique features usually invites copycat products to marketplaces. The Cord Wrapper, being a groundbreaking and unique solution in the Niche Space, experienced no exception in this regard.

100.    Since February 2022[4], which is immediately following the initial 19-month AMC Period, products which directly copy the Cord Wrapper[5] (hereinafter "direct copycat products"), primarily sold by overseas sellers based in China, began flooding major online marketplaces, including but not limited to Amazon.com, eBay.com, Alibaba.com, AliExpress.com, Joybuy, Temu.com, Walmart.com and Wish.com, in astoundingly massive numbers. According to HHT-directed investigations, by July 2023. the number of listings of direct copycat products reached an astounding at least 537 and the number of online sellers responsible for those direct copycat listings reached at least 370.

101.    The direct copying of the Cord Wrapper does not stop at online marketplaces. In fact, a direct copycat product (over the Cord Wrapper), which belonged to Defendant Evriholder, was found on the shelves inside brick-and-mortar stores of Walmart as early as March 2023. As will be provided below, primarily due to the known impulse-buy nature of products in the Niche Space (which that direct copycat product is in), Evriholder's offering of that direct copycat product on the shelves of brick-and-mortar stores of Walmart has inflicted irreparable damages in at least the form of a tremendous loss of profit which HHT would have otherwise made – but for Evriholder's below-provided egregious infringement acts with that direct copycat product – through partnering with Walmart's brick-and-mortar stores in the form of offering the Cord Wrapper on the shelves of the same stores.

---

[4] A product directly copying the Cord Wrapper was first discovered on Amazon in December 2021. Between December 2021 and January 2022, the number of products directly copying the Cord Wrapper discovered on Amazon was relatively limited, as compared to a massive number of direct copycat products, primarily from overseas online sellers, discovered between February 2022 and October 2023, which was the approximate time when vast majority of those online listings of direct copycat products were extinguished through "default judgment" court orders (against those overseas sellers) issued from two so-called "Schedule A" federal court cases (which HHT filed) on IP-related grounds (including the ground of infringement of the 'D776 design patent as alleged by HHT).

[5] There were also products (sold online) which were not directly copying the Cord Wrapper's dome-with-scalloped design but copying the "single permanent configuration" design paradigm of the Cord Wrapper, as detailed above. These products are not included in the allegations relating to "direct copycat products" as provided in this Complaint.

*vii.    Conclusion*

102.    To summarize, for the Asserted Patent, not only did the relevant prior art invariably teach away from, and therefore calls for the finding of the patentability of, its patent claims as embodied by the Cord Wrapper, but the overwhelming evidence supporting the secondary considerations as pertaining to the inquiry of non-obviousness with respect to the Cord Wrapper – secondary considerations which include failure of others as indicated, the praises and recognition as given by the consumer products industry, the sustained commercial success as achieved in the AMC period as well as in multiple *impulse-stimulating* settings of QVC, and the massive-copying as unsurprisingly ensued – strengthens and necessitates the same finding of the patentability. Accordingly, the Asserted Patent is a valid and enforceable patent.

## HHT'S EFFORT TO APPRISE THE PUBLIC OF IP RIGHTS ASSOCIATED WITH THE CORD WRAPPER

103.    To materialize intellectual property ("IP") rights associated with the Cord Wrapper, since December 2019, HHT managed to file, besides the Underlying '477 Application (which is a utility patent application), applications for different IP rights before the USPTO and managed to receive from the USPTO corresponding IP rights, including rights to specific federal trademarks and federal copyrights for various associated images as well as rights to Design Patent No. D913,776 (hereinafter "the 'D776 design patent"). A copy of the 'D776 design patent is attached hereto as Exhibit 4. Most of the aforementioned IP rights associated with the Cord Wrapper were issued before March 2023 (the time around which Evriholder was discovered selling its direct copycat product in brick-and-mortar stores of Walmart, as will be provided below), including the 'D776 design patent, which was issued on March 23, 2021.

104.    Since December 2019, HHT has made conscious and consistent effort to apprise the public of IP rights under which the Cord Wrapper is protected or otherwise associated with the Cord Wrapper, including the specific IP rights provided above.

105.    First, since at least March 2020, which was the inception time of the TCW Website, the TCW Website has included a specific web page (hereinafter "the TCW IP Rights Page") where detailed information of all the issued and pending IP rights (belonging to HHT and associated with the Cord Wrapper), have been provided and timely updated as needed for the purpose of apprising the public of the same up-to-date IP rights in a timely and accurate manner.

106.    Thus, on or around November 12, 2020, which was the pre-scheduled publication date of the '185 Patent Publication, the TCW IP Rights Page was timely and accurately updated with information about the pending utility patent right associated with the '185 Patent Publication. Similarly, on or around March 23, 2021, which is the pre-scheduled issue date of the 'D776 design patent, the TCW IP Rights Page was timely and accurately updated with information about the issued design patent rights stemming from the 'D776 design patent. Likewise, on or around November 21, 2023, which is the pre-scheduled issue date of the Asserted Patent, the TCW IP Rights Page was timely and accurately updated with information about the issued utility patent rights stemming from the Asserted Patent.

107.    To give an idea what the TCW IP Rights Page looks like, FIG. 6A shows the TCW IP Rights Page as of April 29, 2025, with an area where the detailed information about the IP rights (under which the Cord Wrapper is protected) being boxed and marked in red.



FIG. 6A

108.    FIG. 6B shows an amplified image of the area (boxed and marked in red in FIG. 6A) in the TCW IP Rights Page where the detailed information about each and every IP rights, including patent rights, under which the Cord Wrapper is protected, is conspicuously and accurately provided.

**United States Design Patent:** US-D913776-S

**United States Utility Patent:** US-11820626-B2

"**The Cord Wrapper**" Logo is a Registered Trademark of Happy Hour Thinking, LLC

The Cord Wrapper **Circular Logo with a Spiral Cord** is a Registered Trademark of Happy Hour Thinking, LLC

Various Images used throughout thecordwrapper.com, as well as 3rd Party Platforms (Amazon, Walmart, Facebook, Instagram, etc.) under the official The Cord Wrapper accounts, have Registered Copyrights.

FIG. 6B

109.    Second, since October 2021, which was the time the Amazon TCW Store was established online and about six (6) months after the 'D776 design patent was issued, HHT has provided, as a typical third-party vendor on Amazon usually does, a store page of its own on Amazon. A respective store page of a typical third-party vender is usually provided to allow a user to easily search for, or otherwise access, an entire set of the products and offerings which the respective vendor offers on Amazon, a page which can be accessed through a simple click of a

corresponding hyperlink typically conspicuously placed and displayed in each product listing page of the respective Amazon vendor.

110.    Particularly for HHT, its store page has been entirely dedicated to the Cord Wrapper, including different offerings in terms of the number of items per pack as well as critical IP information associated with the Cord Wrapper. Since October 2021, the design patent number of the 'D776 design patent has been displayed on HHT's store page in a conspicuous and accurate manner. Later on, the utility patent number of the Asserted Patent was likewise displayed on HHT's store page around November 21, 2023, which was when the Asserted Patent was issued. Thus, HHT's store page has also served to apprise the public, particularly those savvy users of Amazon (e.g., savvy to navigating of Amazon to locate specific information about a particularly interested product offered on Amazon), that the Cord Wrapper was protected under both the design patent rights afforded by the 'D776 design patent, and the utility patent rights afforded by the Asserted Patent.

111.    To give an idea of how HHT has achieved the notifying of the public with regard to design and utility patent rights under which the Cord Wrapper is protected using its store page dedicated to the Cord Wrapper, FIGS. 7A and 7B are provided below, where FIG. 7A shows a screen-captured version of the store page of HHT as of May 8, 2025 and FIG. 7B shows a Cord Wrapper listing page as of May 8, 2025 where the corresponding hyperlink directed to HHT's store page is conspicuously placed and displayed.



Listed IP information of the Cord Wrapper

Patents: US-D913776-S, US-11820626-B2

FIG. 7A (HHT's Store Page)



Hyperlink to store page

FIG. 7B (A Cord Wrapper Listing Page)

112.    Accordingly, between early October of 2021 and late November of 2023, a user savvy to Amazon actively looking for products in the Niche Space should have been reasonably expected to be apprised of the 'D776 design patent as associated with the Cord Wrapper. And since late November of 2023, such a savvy user should have been reasonably expected to be apprised of both the 'D776 design patent and the Asserted Patent, as associated with the Cord Wrapper.

113.    Third, since September 2023, to apprise the public of IP rights associated with the Cord Wrapper, the packaging of each commercially offered or sold item of the Cord Wrapper has provided, in a conspicuous manner, the URL (hereinafter "the TCW IP Rights URL") of HHT's TCW IP Rights Page (which, as provided above, has provided up-to-date information about the

issued and pending IP rights associated with the Cord Wrapper since March 2020). FIG. 8A shows the back side of the packaging of a commercially available item of the Cord Wrapper in which the TCW IP Rights URL is provided, with an area (in the back side of the packaging) where the TCW IP Rights URL is provided being boxed and marked in red. FIG. 8B shows an amplified image of the area (boxed and marked in red in FIG. 8A) where both the TCW IP Rights URL as well as HHT's name are conspicuously provided.




FIG. 8A                          FIG. 8B

**BACKGROUND AND FACTS ABOUT EVRIHOLDER**

*i.    General Allegations About Evriholder*

114.    Upon information and belief, Evriholder is a consumer products company boasting a broad product portfolio in a wide variety of household categories including kitchen, produce, baking, barware, bath and beauty, cleaning, pet, storage & organization, toy, seasonal, and more, with over 3,000 products distributed for sale in approximately 100,000 stores in over 35 countries across the world.

115.    Upon information and belief, Evriholder was founded in 1995 by three founders including Ivan Stein and Gary Seehoff. During its three-decade history, Evriholder has experienced multiple ownership changes. Its latest major ownership change occurred in January 2023 where Evriholder was acquired by Kainos Capital, an investment firm based in Dallas, Texas that focuses

exclusively on food and consumer industries and has, since inception, completed over 40 transactions with a total transaction value of approximately $6 billion. Despite Evriholder's multiple ownership changes, Evriholder's company leadership has kept substantial continuity, as Ivan Stein has been, over Evriholder's three-decade history, continuously serving a principal position of the company's management.

116.    Evriholder has touted itself as an "*innovative* company that specializes in a wide variety of household categories" (emphasis added) as well as an "*impulse industry leader*" (emphasis added), with a "commitment … to introduce *innovative* products to *nearly all retail channels* including specialty, mass merchants, supermarket, drug store, hardware store, club, catalog, online, and many more" (emphasis added).

117.    Upon information and belief, Evriholder was praised by one of its past ownership entities as serving as "a strategic partner to the country's leading retailers with strong brand recognition and a reputation within the industry for *consistent product innovation*, … and *rapid speed to market capabilities*." (emphasis added). In those regards, Evriholder has been known to have been introducing *well over 100* new products annually, encompassing both its own branded items and those developed through *licensing* partnerships.

118.    Thus, at the outset, at least on one hand, Evriholder shall be regarded an "*impulse-buy products*" guru in the general space of consumer products and having access to nearly all retail chains, with the expertise and ability to not only introduce over 100 new products to market annually but with *a rapid speed* to make that happen.

119.    In addition, at least on another hand, Evriholder, *in light of its express touting of itself as being an "innovator" as well as other key considerations (as will be provided below)*, shall also be regarded a "patent" guru expected of at least two patent-related notions *when it comes*

*to its having awareness and knowledge of a particular innovative product*, as will be further provided below.

### ii.    *The Impulse-Buy Products Guru Aspect of Evriholder*

120.    The impulse-buy products guru aspect of Evriholder naturally flows from the combination of Evriholder's conspicuous claim to be an "impulse industry leader" on its own website and its focus on "*rapid speed to market*," which necessitates that Evriholder has possessed a high degree of market awareness. Success in the impulse category naturally hinges on quickly identifying trends, understanding consumer desires for novelty and value, and responding fast to what relevant marketplaces need. Thus, this impulse-buy products guru aspect of Evriholder naturally calls for the notion that Evriholder has since long ago been expected to have expertise in, and capabilities of, close monitoring of introductions of innovative products in niche spaces, identifying not only those innovative products having gained traction among consumers but the respective sources thereof as well as the respective intellectual property associated therewith, and finding ways to *rapidly* introduce its *in-house-developed* or its *licensed-from-a-partner* products to compete against those innovative products for market share.

### iii.    *The Patent Guru Aspect of Evriholder*

121.    The patent guru aspect of Evriholder *when it comes to its having awareness and knowledge of a particular innovative product*, should be apparent even at the outset with specific content provided on Evriholder's own website as pertaining to Evriholder being an innovator itself. More specifically, Evriholder went *much* further on its official website than merely touting itself as an "innovator." First, Everiholder has emphasized, as shown below in FIG. 9A, "Inspired, the founders began to pursue relationships with *inventors* and product developers worldwide in order to design and offer more *innovative* product solutions for consumers." (emphasis added).



FIG. 9A

122.    In addition, Everiholder has provided, as shown below in FIGS. 9B-C, a special means for anyone in the public who "has the next BIG idea" to submit the BIG idea to Evriholder.



FIG. 9B                                FIG. 9C

123.    Further, Everiholder has provided, as shown below in FIG. 9D, a "Patents" web page where a list of its representative patents is showcased.

**Patents**

Avo Saver - Utility - 8074829 - United States

Cutlery Cleaner - Design - D691772 - United States

Dressing 2 Go - Design - D689336 - United States

FurRemover - Design - D675026 - United States

Hot Dog Slicer - Design - D670140 - United States

Spongeables - Utility - 8546640 - United States

Deluxe Grip n' Store - Utility - 8220656 - United States

FIG. 9D

124.    Thus, even at the outset based on its own website alone, Evriholder has been holding itself out to the public as an innovator not only having a portfolio of patents protecting its own past inventions but actively soliciting new BIG ideas from the public. This preliminary observation, combined with the fact that Evriholder is owned by an institution having completed transactions worth billions of dollars, at least calls for a first notion (as pertaining to patent rights) of which Evriholder is expected, namely, the notion (hereinafter "the First Patent-Related Notion of Expectation") that Evriholder should be expected of having an expert level of savviness with respect to navigating the US patent system to protect its own past innovations.

125.    With respect to this First Patent-Related Notion of Expectation concerning Evriholder, legacy and evidence of Evriholder's expert level of savviness with respect to navigating the US patent system dates back to Evriholder's early days. Upon information and belief, Evriholder was founded after Gary Seehoff, one of Evriholder's co-founders, invented Evriholder's first two products (namely, Twirl A Tieâ and Twirl A Beltâ). In addition, as of late, the public records available at online portals of the USPTO indicate that there are at least seventy-six (76) patents issued with Evriholder being the assignee, with the respective patent issue dates spanning from 2004 to 2025. Of the seventy-six (76) issued patents, six (6) of them are utility patents and seventy (70) of them are design patents. Also. of the same seventy-six (76) issued patents, fifty-three (53) of them list its co-founder Gary Seehoff as either the inventor or a co-inventor of the

respective patents. Thus, with this relatively substantial number of patents issued and the fact that one of its co-founders has been at the forefront in terms of extensive involvement with the US patent system to gain patent protection for his own inventions, Evriholder should be expected to have an expert level of knowledge and familiarity (e.g., through its internal and/or external patent counsels), as to the nuts and bolts of the US patent system administered by the USPTO.

126.    As a first example of this expected expert level of knowledge and familiarity of Evriholder with respect to the US patent system, Evriholder should be expected to have an expert level of knowledge and familiarity with respect to regularly and timely monitoring issued utility patents or published utility patent applications relevant to, e.g., a particular innovative product which it identified as a target for copying once Evriholder, e.g. had knowledge of a particular design patent under which that same particular innovative product is protected.

127.    As a second example of this expected expert level of knowledge and familiarity of Evriholder with respect to the US patent system, Evriholder should be expected to have an expert level of knowledge and familiarity with respect to online portals of the USPTO for accessing and getting hold of patenting information already in the public domain, such as the prosecution history of an already-published patent application and assignee information of an already-issued patent.

128.    Regarding the patent guru aspect of Evriholder, besides the First Patent-Related Notion of Expectation, a second patent-related notion of expectation (hereinafter "the Second Patent-Related Notion of Expectation") should also be expected of Evriholder. Namely, Evriholder should be expected to understand the necessity of respecting the patent rights of other innovators (like HHT) with respect to their patented inventions. And more particularly, Evriholder should be expected to have the *highest* incentive to conduct the *highest* level of due diligence with respect to making sure that a particular product of its own does not infringe a valid utility patent.

129.    Concerning the Second Patent-Related Notion of Expectation (as pertaining to Evriholder), Everiholder has been consistently holding itself out through its own website as, *inter alia*, being an *innovator* not only having a portfolio of patents protecting its own past inventions but actively soliciting new BIG ideas from the public. Thus, Evriholder should be expected to understand the necessity of respecting the patent rights of other innovators (like HHT) with respect to their patented inventions.

130.    Besides, two additional considerations, as will be provided below, collectively require that Evriholder should be expected to have the *highest* incentive to conduct the *highest* level of due diligence with respect to making sure that a particular product of its own does not infringe a valid patent.

131.    As the first additional consideration, Evriholder is not a stranger to patent infringement controversies that arose to the level of itself being either a defendant or plaintiff to a lawsuit filed in a federal court involving one or more causes of action for patent infringement. Upon information and belief, between 2012 and 2024, Evriholder was either a defendant or plaintiff to at least eight (8) such federal court patent infringement cases, the most recent of which was filed in 2024. Of these eight (8) cases, four (4) of them were filed against Evriholder where Evriholder was the respective alleged defendant infringer, and the other four (4) of them were filed by Evriholder where Evriholder was the respective plaintiff alleging patent infringement against one or more alleged respective defendant infringers.

132.    As the second additional consideration, Evriholder touted itself as a strategic partner to the country's leading retailers. However, it is known that a major leading retailer, such as Walmart, typically requires a respective vendor, such as Evriholder, to sign a retailer agreement which requires the respective vender to, *inter alia*, *warrant* that none of its products infringe IP

rights of a third-party, including utility patent rights of the third-party. As an example of such a no-IP-infringement warranty requirement, Walmart's retailer program includes a provision containing such a requirement, with the provision provided below in FIG. 10 and relevant portions thereof highlighted.

> (e)    **Product Authenticity.** You may only sell Products through the Marketplace Program that are authentic. You will maintain adequate processes and procedures for conducting diligence to assure that Products are authentic, authorized for sale, and not stolen, counterfeit, illegal or misbranded. You may not (and you represent and warrant that you will not) list any Product or Retailer Product Content on the Walmart.com Sites or through the Marketplace Program that is counterfeit, illegal, stolen, or fraudulent, or infringes any third-party "**Intellectual Property Rights**" (meaning any patent, copyright, trademark, service mark, trade dress (including any proprietary "look and feel"), trade name, logo, moral right, trade secret and any other intellectual property or proprietary right), or that you otherwise do not have the right to sell.  All information you provide about the Product will be accurate, current, and complete and not misleading, deceptive, or fraudulent in any way.

FIG. 10

133.    Accordingly, Evriholder is particularly expected to have the *highest* incentive to conduct the *highest* level of due diligence with respect to a particular product of its own not infringing a valid utility patent, especially when Evriholder not only had the knowledge of the valid utility patent but knew that the particular product of its own was *not* developed by itself but instead *copied* from an innovative product of someone else's which is under the protection of the same utility patent.

134.    Hereinafter, the above-alleged First and Second Patent-Related Notions of Expectation, which should be expected of Evriholder as pertaining to patent rights, will be simply referred to as "the Two Patent-Related Notions of Expectation."

## **EVRIHOLDER'S COPYING OF HHT'S CORD WRAPPER**

135.    Upon information and belief, Evriholder, despite having reportedly had over 3,000 consumer products distributed over nearly all retail channels, was at the outset not known to the public that it had any particular product of significance of its own in the Niche Space prior to at least March 2023, as it was not known to have had ever invented, or otherwise engaged in

researching and developing either in-house or through one of its wholly owned subsidiaries, a particular product of significance of its own in the Niche Space.

136.    Upon information and belief, despite this known deficiency of itself as to the Niche Space, Evriholder came out of nowhere and forayed into the Niche Space – *via shelves of brick-and-mortar stores of at least one major retail chain (namely, Walmart) and multiple online e-commerce platforms (including at least Walmart.com)* – through its actions (hereinafter "Evriholder's Utility Patent Infringement Actions") of offering to sell, or otherwise placing into the stream of commerce, a product which it has branded, or otherwise has labeled, "Cord Keeper," Hereinafter, the aforementioned Evriholder's "Cord Keeper" product, or an item thereof, will be simply referred to as "Evriholder's Cord Keeper."

137.    Evriholder's Cord Keeper, as will be provided below, has in fact copied the Cord Wrapper to such an egregious extent that it looks almost identical to the Cord Wrapper and predictably infringes the claims of the Asserted Patent. FIG. 11A provides a side-by-side comparison between the visual appearance of the Cord Wrapper and that of Evriholder's Cord Keeper.



The Cord Wrapper                    Evriholder's Cord Keeper

FIG. 11A

138.    As can be readily seen, the respective visual appearances of the two products are nearly identical in that each comprises, in a nutshell, a respective dome and a respective combination of a base and a post disposed therebetween. In addition, as demonstrated, even the respective logos etched on the respective tops of the respective domes, which are respective *non-utility* aspects of the two products, look almost indistinguishable in the eyes of a regular customer taking a casual look at the two products.

139.    FIGS. 11B-D provides side-by-side comparisons between the packaging of the Cord Wrapper and the packaging of Evriholder's Cord Keeper, with respective corresponding portions thereof highlighted in red.




The Cord Wrapper                    The Cord Keeper

FIG. 11B





The Cord Wrapper                    The Cord Keeper

FIG. 11C







The Cord Wrapper                    The Cord Keeper

FIG. 11D

140.    Accordingly, even a casual comparison made between the packaging of the Cord

Wrapper and the packaging of Evriholder's Cord Keeper will draw the inevitable observation that

the two products are almost identical in appearance, structure, the purported use, the purported manner in which how the purported use is to be carried out, and even the *non-utility* logo, inevitably indicating that Evriholder's Cord Keeper was *directly copied* (by Evriholder) from the patented Cord Wrapper. This inevitable indication is, as will be provided below, in fact readily confirmed collectively by considerations drawn from the circumstantial evidence, including ones drawn from the fact that Evriholder has been both an *impulse-buy products* guru and a *patent* guru.

141.    Indeed, Evriholder's Cord Keeper as an apparatus and the use of Evriholder's Cord Keeper (as expressly instructed in the packaging of Evriholder's Cord Keeper) as a method respectively include all the limitations of claims 1-20 of the Asserted Patent, as set forth in detail in the infringement claim chart provided in Exhibit 2, and therefore respectively infringe claims 1-20 of the Asserted Patent.

### EVRIHOLDER'S PROLONGED KNOWLEDGE OF THE CORD WRAPPER, THE UNDERLYING '477 APPLICATION, THE '185 PUBLICAITON AND THE ASSERTED PATENT

142.    Being both an *impulse-buy products* guru and a *patent* guru, Evriholder, as will be provided below, in fact must or otherwise should have had, and therefore shall be regarded as having had, prolonged knowledge of the Cord Wrapper, the Underlying '477 Application, the '185 Publication and the Asserted Patent.

*i.    Evriholder's Prolonged Knowledge of the Cord Wrapper at Least Through Amazon*

143.    Evriholder must or otherwise should have had, and therefore shall be regarded as having had, knowledge of the Cord Wrapper (as an innovative product having gained traction among consumers) since at least soon after October 2021, which was the time when the Cord Wrapper debuted on Amazon, if not earlier or much earlier. In fact, conservatively speaking, given the Cord Wrapper's *stellar* commercial success achieved in the holiday-shopping month of

December 2021 as indicated by both its sales performance and premium-pricing, Evriholder must

or otherwise should have had, and therefore shall be regarded as having had, knowledge of the

Cord Wrapper since at least January 2022, if not earlier or even much earlier. This inevitable

finding should be readily apparent due to at least four considerations provided below.

144.    As the first consideration (concerning whether and how early Evriholder had

knowledge of the Cord Wrapper), Amazon had to be, and therefore was, one of the few

marketplaces MOST closely monitored by Evriholder as of at least October 2021, which is when

the Cord Wrapper debuted on Amazon. As provided above, the *impulse-buy products* guru aspect

of Evriholder calls for the notion that Evriholder has since long ago been expected to have expertise

in, and capabilities of, close monitoring introductions of innovative products in niche spaces,

identifying not only those innovative products gaining tractions among consumers but also the

respective sources thereof. On the other hand, Amazon has been by far the largest and most

dominant online marketplace in North America way before October 2021. Thus, this first

consideration should be apparent.

145.    As the second consideration (concerning whether and how early Evriholder had

knowledge of the Cord Wrapper), Evriholder's expected expertise and capabilities, as pertaining

to achieving those monitoring and identifying purposes in connection with innovative products and

the respective sources thereof, were *not only* expected, but further amplified, with respect to

Amazon. This is because Amazon has, since long ago prior to 2021, been well known to provide

to the public plethora of information and data about products (offered on its platform) that enable

savvy third-parties (such as Evriholder) to closely monitoring introductions of innovative products

in niche spaces and identify particular innovative products which were gaining traction among

consumers. In fact, the plethora of information and data about products offered on Amazon, as

provided by Amazon, had long ago prior to October 2021 enabled various commercial tools (such as Helium 10) specifically built to facilitate savvy third-parties (such as Evriholder) to achieve those monitoring and identifying purposes through Amazon, thus amplifying such a savvy third-party (such as Evriholder) with respect to the same expertise and capabilities.

146.    As the third consideration (concerning whether and how early Evriholder had knowledge of the Cord Wrapper), Evriholder's Cord Keeper, as already provided above, resembles the Cord Wrapper to the extent that two products are *almost identical* in terms of appearance, structure, purported use, purported manner in which how the purported use is to be carried out, and even *non-utility* logo. This unmistakably indicates that not only did Evriholder identify, and therefore had knowledge of, the Cord Wrapper at some point in time, but Evriholder also apparently in the meantime identified the Cord Wrapper *as a target for copying* (for the apparent purpose of placing its copycat product, which in this case is the Cord Keeper, in the stream of commerce), and later *directly* copied the Cord Wrapper in coming up with its Cord Keeper. This finding is especially apparent given that Evriholder was not known to have developed its own product in the Niche Space before it offered its Cord Keeper in marketplaces.

147.    As the fourth consideration (concerning whether and how early Evriholder had knowledge of the Cord Wrapper), the Cord Wrapper had undoubtedly gained traction among consumers on Amazon between October 2021 and January 2022, as indicated by the sustained commercial success which the Cord Wrapper had achieved during that same period. In fact, as provided above, the Cord Wrapper's commercial success during that same period was not only with respect to the *monthly sale volume* as one indicator, but also with respect to *its premium pricing* as another indicator, both indicators which were known to have been visible to Amazon users and the aforementioned Amazon-targeted third-party commercial tools prior to October 2021.

148.    As already established by the aforementioned first and second considerations (both concerning whether and how early Evriholder had knowledge of the Cord Wrapper), Evriholder had amplified expertise and capabilities as pertaining to closely monitoring of the introduction of, and identifying, an innovative product with respect to Amazon. As such, the combination of the aforementioned third and fourth considerations (both concerning whether and how early Evriholder had knowledge of the Cord Wrapper) should unmistakably indicate and establish that Evriholder, in taking advantage of its aforementioned amplified expertise and capabilities, took notice of, paid attention to, and identified, the Cord Wrapper as not only an innovative product having gained traction among consumers but *a target for copying* as well, since at least January 2022.

149.    This finding is not at all surprising. As provided above, over 500 online overseas sellers started selling direct copycat products of the Cord Wrapper online since February 2022 (which is about four (4) months after the Cord Wrapper debuted on Amazon in October 2021), indicating the fact that those over 370 online overseas sellers invariably took notice of, paid attention to, and identified, the Cord Wrapper not only as an innovative product having gained traction among consumers but *a target for copying* at least several months in advance of February 2022, which makes January 2022 a *conservative* estimate as to when the identifying, by those massive online overseas copycat sellers, of the Cord Wrapper as *a target for copying* materialized.

150.    Evriholder, being a recognized leader in *impulse-buy products*, was certainly expected to have at least a level of expertise and capabilities (as pertaining to closely monitoring of the introduction of, and identifying of, an innovative product with respect to Amazon) on par with any of the aforementioned 370-plus overseas online copycat sellers. Thus, Evriholder's identifying of the Cord Wrapper as not only an innovative product having gained traction among consumers but *a target for copying* since at least January 2022 is not at all surprising.

151.    Accordingly, these aforementioned four considerations (concerning whether and how early Evriholder had knowledge of the Cord Wrapper) considered, there should be *no doubt whatsoever* that Evriholder must or should have had, and therefore shall be regarded as having had, knowledge of the Cord Wrapper since at least January 2022, if not earlier or even much earlier.

ii.    *Evriholder's Prolonged Knowledge of the '185 Publication and the Underlying '477 Application*

152.    Evriholder must or otherwise should have had, and therefore shall be regarded as having had, knowledge of the '185 Publication and the Underlying '477 Application since at least January 2022 due to at least two considerations provided below.

153.    As the first consideration (concerning Evriholder's knowledge of the '185 Publication and the Underlying '477 Application), Evriholder must or otherwise should have had, and therefore shall be regarded as having had, knowledge of the 'D776 design patent (as associated with the Cord Wrapper) through Amazon since at least January 2022.

154.    This consideration is in fact fairly apparent. Evriholder, *being an impulse-buy products guru*, had been expected to have had expertise and capabilities pertaining to, as provided above, identifying an innovative product as well as the source thereof, which translates to Evriholder's expected savviness with respect to navigating Amazon to identify the source of the identified innovative product.

155.    In the meantime, as provided above, the design patent number of the 'D776 design patent has all along been conspicuously provided on HHT's store page (dedicating to the Cord Wrapper) of Amazon. As provided above, an Amazon vendor's store page is known to a savvy user (like Evriholder) as a special page for providing information about one or more products (offered by the respective store owner) that may otherwise not be readily available on an isolated product-listing page of the respective store owner, a special page of the vendor which a savvy user

(like Evriholder) interested in knowing about the one or more products of the vendor knows how to navigate to.

156.    As such, once Evriholder identified through Amazon the Cord Wrapper as a target for copying (which materialized at least January 2022), the *impulse-buy products guru* aspect of Evriholder not only gave Evriholder the apparent purpose (which was to find more detailed information about the Cord Wrapper, such as the entity behind and owning the Cord Wrapper), but afforded the expertise in enabling Evriholder to navigate to HHT's store page of Amazon, with and through which Evriholder must or otherwise should have had, and therefore shall be regarded as having had, knowledge of the 'D776 design patent (under which its identified Cord Wrapper was protected).

157.    Accordingly, Evriholder must or otherwise should have had, and therefore shall be regarded as having had, knowledge of the 'D776 design patent through Amazon since at least January 2022.

158.    As the second consideration (concerning Evriholder's knowledge of the '185 Publication and the Underlying '477 Application), once Evriholder had the knowledge of the 'D776 design patent (which materialized at least January 2022) as an IP instrument under which its identified Cord Wrapper was protected, Evriholder must or otherwise should have had, and therefore shall be regarding as having had, the knowledge of the '185 Publication (including those claims included therein which read on Evriholder's Cord Keeper) and the Underlying '477 Application, at least due to, per the above-alleged Two Patent-Related Notions of Expectation concerning Evriholder, the following sub-considerations.

159.    As the first sub-consideration, Evriholder, through knowledge of the 'D776 design patent, must or otherwise should have, and therefore shall be regarded as having, got hold of the entirety of the 'D776 design patent through the USPTO.

160.    Next, as the second sub-consideration, once Evriholder had got hold of the entirety of the 'D776 design patent, Evriholder also got hold of the abundance of information contained in the 'D776 design patent as relating to IP associated with the Cord Wrapper, which is a form of the underlying article which the 'D776 design patent protects.

161.    The front page of the 'D776 design patent is reproduced below.



US00D913776S

(12) **United States Design Patent** (10) Patent No.: **US D913,776 S**

Kohli et al. (45) **Date of Patent:** ** Mar. 23, 2021

(54) **ELECTRICAL CORD STORAGE DEVICE**

(71) Applicants: **Ryan Kohli**, Plain City, UT (US); **Kevin Neumayer**, Ogden, UT (US); **Krystal Neumayer**, Ogden, UT (US)

(72) Inventors: **Ryan Kohli**, Plain City, UT (US); **Kevin Neumayer**, Ogden, UT (US); **Krystal Neumayer**, Ogden, UT (US)

(**) Term: **15 Years**

(21) Appl. No.: **29/716,576**

(22) Filed: **Dec. 10, 2019**

(51) **LOC (13) Cl.** .............................................. **08-05**

(52) **U.S. Cl.**
USPC ........................................................ **D8/356**

(58) **Field of Classification Search**
USPC ............. D8/358, 354, 356, 360.1, 349, 352;
D13/184, 154, 156, 153
CPC ............................. B65H 75/4421; H02G 11/02
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| D88,337 | S | * | 11/1932 | Massey ........................ D13/154 |
| 2,838,905 | A | * | 6/1958 | Marble ................... G04C 10/00 |
| | | | | 368/276 |
| 5,848,701 | A | * | 12/1998 | Riccabona ............... B25H 3/00 |
| | | | | 206/702 |
| D410,631 | S | * | 6/1999 | Foster ........................... D13/156 |
| D569,710 | S | * | 5/2008 | Young ........................... D13/154 |
| D658,482 | S | * | 5/2012 | Pratt ............................... D8/349 |
| D692,293 | S | * | 10/2013 | Toscani ........................... D8/356 |
| 8,781,148 | B2 | * | 7/2014 | Minarik ................. H04R 1/1033 |
| | | | | 381/384 |

| | | | | |
|---|---|---|---|---|
| D737,119 | S | * | 8/2015 | Condon ........................ D8/352 |
| 9,890,012 | B1 | * | 2/2018 | Polen ................... B65H 75/406 |
| 9,908,741 | B2 | * | 3/2018 | Rodriguez ......... B65H 75/4473 |
| D886,093 | S | * | 6/2020 | Dubanowich ............ D14/253 |
| 2020/0354185 | A1 | * | 11/2020 | Kohli ...................... H02G 1/00 |

* cited by examiner

*Primary Examiner* — Keli L Hill
*Assistant Examiner* — Harold E Blackwell, II
(74) *Attorney, Agent, or Firm* — Bryant J. Keller; Kirton McConkie

(57) **CLAIM**

The ornamental design for an electrical cord storage device, as shown.

**DESCRIPTION**

FIG. 1 is a top perspective view showing our new design for an electrical cord storage device;
FIG. 2 is a bottom perspective view thereof;
FIG. 3 is a front elevation view thereof, the back elevation view being a mirror image thereof;
FIG. 4 is a right side elevation view thereof, the left side elevation view being a mirror image thereof;
FIG. 5 is a top plan view thereof;
FIG. 6 is a bottom plan view thereof; and,
FIG. 7 is a left side view thereof coupled to an electrical appliance having a cord.
The broken lines in the drawings illustrate portions of the electrical cord storage device which form no part of the claimed design. The broken line portions shown in FIGS. 7 of the electrical appliance and cord illustrate environmental subject matter only and form no part of the claimed design.

**1 Claim, 4 Drawing Sheets**



FIG. 10

162.    As shown in FIG. 10, the front page of the 'D776 design patent alone already contains abundant IP-related information about the underlying article (of which the Cord Wrapper is form) which it protects, including the names of the inventors thereof as well as a visual appearance thereof.

163.    Still next, as the third sub-consideration, once Evriholder, through getting hold of the entirety of the 'D776 design patent, got hold of abundant information contained in the 'D776 design patent as relating to IP associated with the Cord Wrapper, Evriholder must or otherwise should have, and therefore shall be regarded as having, had knowledge of, *inter alia*, the '185 Publication (including those claims included therein which read on Evriholder's Cord Keeper) and the Underlying '477 Application.

164.    More specifically, with Evriholder having got hold of IP-related information as pertaining to the Cord Wrapper – such as the specific patent number of the 'D776 design patent, the specific "Cord Wrapper" name of the Cord Wrapper, and the names of the three inventors contained in the 'D776 design patent – Evriholder must or otherwise should have, and therefore shall be regarded as having, acquired the knowledge of the '185 Publication (including those claims included therein which read on Evriholder's Cord Keeper) and the Underlying '477 Application through at least two parallel avenues which Evriholder was expected to have expertise in and familiarity with.

165.    As for the first avenue, Evriholder should have been expected to acquire the knowledge of the '185 Publication and therefore the Underlying '477 Application through the publicly-accessible TCW IP Rights Page (as specifically provided by HHT since February 2020), of which Evriholder should be expected to have become aware through conducting something as

simple as a casual and quick Internet search (something which Evriholder was certainly motivated to do under the circumstances as well as expected of being capable of doing).

166.    In that regard, Evriholder must or otherwise should have, and therefore shall be regarded as having, managed to discover, or otherwise locate, the publicly-accessible TCW IP Rights Page, which had been, as provided above, specifically provided since January 2022 so that the public can be timely apprised of all the available specific IP rights under which the Cord Wrapper is protected.

167.    This is because as of January 2022, even conducting a casual and quick key-word-based Internet search against popular search engines such as Google or Bing using the aforementioned IP-related information (as pertaining to the Cord Wrapper) – *which should have been expected of Evriholder under the circumstances (particularly including the apparent circumstance where, as provided above, Evriholder had identified the Cord Wrapper as a target for copying as of at least January 2022)* – yielded, as the TCW Inventors intended and confirmed, search results where the TCW IP Rights would be listed at or near the top thereof.

168.    As such, Evriholder must or otherwise should have, and therefore shall be regarded as having, had knowledge of the TCW IP Rights Page, through which Evriholder shall be regarded as having the knowledge of, *inter alia*, the '185 Publication (including claims included therein which read on Evriholder's Cord Keeper) and the Underlying '477 Application.

169.    Turning to the second avenue, Evriholder should have been expected to acquire the knowledge of the '185 Publication and the Underlying '477 Application through even several quick patent-related searches taking advantages of well-known tools and portals provided to the public by the USPTO and routinely used by patent practitioners (whom Evriholder was certainly expected to have either in-house or have access to through external resources available to Evriholder).

170.    More specifically, with Evriholder having the knowledge of, *inter alia*, the names of the TCW Inventors and an underlying invention being a device used to store the cord of an electrical appliance, Evriholder, being a patent guru, should have been expected to acquire the knowledge of the '185 Publication and therefore the Underlying '477 Application through, e.g., one or more routine targeted patent searches using the names of the TCW Inventors through well-known patent search portals of the USPTO.

171.    Accordingly, for the third sub-consideration (as pertaining to the second consideration concerning Evriholder's knowledge of the '185 Publication and the Underlying '477 Application), once Evriholder got hold of abundant information contained in the 'D776 design patent as relating to IP associated with the Cord Wrapper, Evriholder must or otherwise should have, and therefore shall be regarded as having, had knowledge of the '185 Publication (including claims included therein which read on Evriholder's Cord Keeper) and the Underlying '477 Application.

172.    Accordingly, at least due to the first and second considerations (both concerning Evriholder's knowledge of the '185 Publication and the Underlying '477 Application), Evriholder must or otherwise should have had, and therefore shall be regarded as having had, knowledge of the '185 Publication and the Underlying '477 Application since at least January 2022.

173.    Notably, there were other events that occurred after January 2022 which should have also led to the finding that Evriholder must or otherwise should have had, and therefore shall be regarded as having had, prolonged knowledge of the '185 Publication and the Underlying '477 Application since a time way prior to the November 21, 2023 issuance date of the Asserted Patent.

174.    As one example, in July 2023, HHT filed a design patent infringement claim on Walmart's online Brand Portal, alleging that Evriholder's Cord Keeper had infringed HHT's 'D776

design patent. On information and belief, Evriholder was made aware of this patent infringement claim by Walmart immediately after Walmart received the design patent infringement claim, indicating that Evriholder was made aware of 'D776 design patent as of July 2023.

175.    As another example, as provided above, since September 2023. the packaging of the Cord Keeper started to include the TCW IP Rights URL in a conspicuous manner, as indicated in FIGS. 8A-B, providing actual notice of HHT's 'D776 design patent to Evriholder. This is because Evriholder had had plenty of reasons for, and therefore must or otherwise should have been, following and paying attention to the commercially available Cord Wrapper since a time way before September 2023.

176.    These other events that occurred after January 2022, however, are at best icing on the cake, if not red herrings, as to the time since which Evriholder must or otherwise should have had, and therefore shall be regarded as having had, knowledge of the '185 Publication and the Underlying '477 Application. That is, these later occurred events does not change the fact that at least due to the first and second considerations (both concerning Evriholder's knowledge of the '185 Publication and the Underlying '477 Application), Evriholder must or otherwise should have had, and therefore shall be regarded as having had, knowledge of the '185 Publication and the Underlying '477 Application since at least January 2022.

### iii.    _Evriholder's Prolonged Knowledge of the Asserted Patent_

177.    Evriholder must or otherwise should have had, and therefore shall be regarded as having had, knowledge of the Asserted Patent since November 21, 2023 due to the considerations provided below at least due to the Two Patent-Related Notions of Expectation concerning Evriholder.

178.    More specifically, Evriholder, at least since January 2022 – by which time, as provided above, Evriholder must or should have had, and therefore shall be regarded as having had, knowledge of the '185 Publication and the Underlying '477 Application – must or should have had, shall be regarded as having had, *very closely monitored*, the Underlying '477 Application of the Asserted Patent as to whether and/or when it had issued into a utility patent through the publicly available portals of the USPTO, including the USPTO's Public PAIR portal (which was retired as of July 31, 2022) and the USPTO's Patent Center portal (which has been available since August 1, 2022). This is apparent given that, as provided above, by January 2022, Evriholder, being a patent guru, had already identified the Cord Wrapper as a target for copying, which led to its *direct copycat* product Cord Keeper being eventually placed in the stream of commerce at least since March 2023.

179.    With Evriholder's expected close monitoring of the Underlying '477 Application, Evriholder must or should have had, shall be regarded as having had, the knowledge of at least the below-provided two key events (as pertaining to the Underlying '477 Application).

180.    As the first key event, on September 1, 2023, the USPTO issued a publicly available "Notice of Allowability" for the Underlying '477 Application, indicating, *inter alia*, that the same '477 application would be issued into patent soon after the issue fee had been paid before the issue fee's specified due date of December 1, 2023. Evriholder, being itself a patent guru, must or should have had, and therefore shall be regarded as having had, not only noted this first key event, but expected that the issue fee be paid by the December 1, 2023 due date at least due to several considerations provide below.

181.    First, by September 1, 2023, as provided above, not only had Evriholder identified the Cord Wrapper as a target of copying, Evriholder had already placed its direct copycat product

Cord Keeper in the stream of commerce, including having placed its Cord Keeper on the shelves inside brick-and-mortar stores of Walmart.

182.    Thus, upon having become aware of the issuance of the "Notice of Allowability" as to the Underlying '477 application, Evriholder, being itself a patent guru, must or should have had, and therefore shall be regarded as having had, known that not only were the to-be-issued claims indeed intended for the protection of the Cord Wrapper from utility patent infringement but the same claims read on its direct copycat product Cord Keeper. Evriholder should have been expected to gain the same knowledge through a routine review by, its patent counsels (either in-house or external), of the to-be-issued claims of the Underlying '477 application in relation to both the Cord Wrapper (as to whether the to-be-issued claims were indeed intended for the protection of the Cord Wrapper from utility patent infringement) and its Cord Keeper (as to whether the to-be-issued claims indeed read on the same product).

183.    As such, Evriholder must or should have had, and therefore shall be regarded as having had, expected that the issue fee to be paid by the December 1, 2023 due date of payment of the issue fee.

184.    Next, as the second key event, on November 1, 2023, the USPTO issued a publicly available "Issue Notification" for the Underlying '477 Application, informing and indicating in advance that the Asserted Patent was to be issued approximately three weeks thereafter on November 21, 2023. Evriholder, being itself a patent guru, must or should have had, and therefore shall be regarded as having had, not only noted this second key event, but became aware of the November 21, 2023 official issuance date of the Asserted Patent.

185.    Accordingly, with the occurrences of the first and second key events, during the 82-day period between September 1, 2023 and November 21, 2023, Evriholder – being itself a patent

guru who was, as provided above, expected to closely monitor the Underlying '477 Application – must or should have, and therefore shall be regarded as having had, known that the issuing of the Underlying '477 Application into an enforceable utility patent (which materialized with the issuing of the Asserted Patent) was not only imminent but was to occur on the definitive date of November 21, 2023.

186.    On November 21, 2023, the Asserted Patent was officially issued by the USPTO. As provided above, given the first and second key events that had occurred as leading to the November 21, 2023 issuing of the Asserted Patent, Evriholder, being itself a patent guru, must or should have, and therefore shall be regarded as having, the knowledge of the Asserted Patent by November 21, 2023.

187.    Accordingly, Evriholder must or otherwise should have had, and therefore shall be regarded as having had, the knowledge of the Asserted Patent since November 21, 2023

## EVRIHOLDER'S EGREIOUS NATURE OF ITS INFRINGEMNT OF HHT'S ASSERTED PATENT

188.    Evriholder's conduct in having committed infringement of the claims of HHT's Asserted Patent as well as those claims of HHT's '185 Publication substantially similar to the infringed claims of HHT's Asserted Patent (through, e.g., Evriholder's offer for sale and sale of its Cord Keeper) since at least March 2023 must be viewed as having risen to the level of wanton, malicious and bad-faith behavior amounting to willful infringement. Further, Evriholder's conduct in having committed the willful infringement must also be viewed – in addition to being wanton, malicious and bad-faith – deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate, the totality of which shall squarely render Evriholder's conduct the precise type of conduct egregious enough to warrant enhanced damages under 35 USC §284.

189.    As provided above, Evriholder has had prolonged knowledge of the '185 publication and the Underlying '477 Application since at least January 2022. Evriholder, per the First Patent-Related Notion of Expectation concerning Evriholder due to its being a patent guru, must or otherwise should have, and therefore shall be regarded as having, known that its Cord Keeper infringes at least some of the claims of the '185 Publication (which are substantially similar to the claims of the Asserted Patent) since at least January 2022. This is because those claims of the '185 Publications literally and squarely read on its Cord Keeper and its intended method of using its Cord Keeper, especially in view of the above-demonstrated "dome with a scalloped edge" embodiment claimed in some of the claims of the '185 Publication, to which its Cord Keeper looks almost identical.

190.    Thus, since January 2022, particularly since at least March 2023, Evriholder must or otherwise should have, and therefore shall be regarded as having, known that both its decision to copy HHT's Cord Wrapper and place its copycat product Cord Keeper into the stream of commerce (including, but not limited to, offering for sale its Cord Keeper on the shelves of brick-and-mortar stores of Walmart), which resulted in its Utility Patent Infringement Actions, would be subject itself to an *unjustifiably* high risk of infringement (by its Cord Keeper) of a valid and enforceable utility patent.

191.    As provided above, since September 1, 2023, Evriholder must or should have, and therefore shall be regarded as having, known that the issuing of the Underlying '477 Application into an enforceable utility patent was imminent and therefore its continuing of its Utility Patent Infringement Actions would subject itself to an even HIGHER risk of infringement (by its Cord Keeper) of a valid and enforceable utility patent than the prior unjustifiably high risk of patent infringement which Evriholder had already subject itself to since January 2022.

192.   As further provided above, since November 21, 2023, Evriholder must or should have, and therefore shall be regarded as having, known that the Asserted Patent was in existence as a valid and enforceable patent and therefore its continued Utility Patent Infringement Actions would subject itself to an even HIGHER risk of infringement (by its Cord Keeper) of a valid and enforceable utility patent than the *unjustifiably* higher and high risk of patent infringement which Evriholder had already subject itself to since September 1, 2023 and January 2022, respectively.

193.   Accordingly, given the Second Patent-Related Notion of Expectation concerning Evriholder – namely, the notion that Evriholder should be expected to understand the necessity of respecting the patent rights of other innovators (like HHT) with respect to their patented inventions, and more particularly, Evriholder should be expected to have the *highest* incentive to conduct the *highest* level of due diligence with respect to making sure that a particular product of its own does not infringe a valid utility patent – Evriholder's initial decision to copy the Cord Wrapper and its later act of carrying out its Utility Patent Infringement Actions since January 2022 were especially wanton, malicious and of bad-faith.

194.   Further, Evriholder's acts of carrying out of its Utility Patent Infringement Actions has been deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate, the totality of which shall squarely render Evriholder's conduct to be the precise type of conduct egregious enough to warrant enhanced damages under 35 USC §284.

195.   More specifically, Evriholder has used its expertise in the area of impulse-buy products *not* for the end of respecting the patent rights of HHT (as an innovator entity) with respect to its patented inventions (as should have been expected from Evriholder per the Second Patent-Related Notion) *but* instead for its deliberately intended end of not just hurting, but instead destroying, HHT (which the Patent Owner of the Cord Wrapper), knowing full well that it was

under the obligation specifically arising from its agreeing to Walmart's retailer agreement requiring a respective vendor to *warrant* that none of its products infringe IP rights of a third-party, including utility patent rights of the third-party.

196.    As provided above, the Cord Wrapper and any direct copycat thereof are impulse-buy products which are most effective, in terms of making sales, when items of these products are placed on in-store shelves of brick-and-mortar retail stores. Having apparently recognized that impulse-buy characteristic of its copycat product Cord Keeper, Evriholder – which is known to have long ago (prior to at least March 2023) already partnered with Walmart with respect to placing its impulse-buy products on in-store shelves of brick-and-mortar retail stores of Walmart – has deliberately placed its Cord Keeper on in-store shelves of brick-and-mortar retail stores of Walmart since at least March 2023 and November 21, 2023, knowing full well that such an act by itself constitutes willful infringement of claims of the '185 Publication and claims of a valid and enforceable utility patent in the Asserted Patent, respectively.

197.    Furthermore, Evriholder has calculatedly set an exceedingly low price for its Cord Keeper, such as $2.94 for one-pack thereof or $5.88 for two-pack thereof, knowing full well that between October 2021 and January 2022, the Cord Wrapper was sold by its Patent Owner HHT at a premium price of $27.99 apparently due to the groundbreaking and unique appeal of the Cord Wrapper to consumers as well as the enormous cost, as incurred by HHT, associated with inventing and developing the Cord Wrapper.

198.    This deliberate act of Evriholder was undoubtedly intended nothing but suffocating and destroying the livelihood of Patent Owner HHT of the Cord Wrapper, with Evriholder having known and intended that such a predatory pricing would not only draw vast majority, if not all, of those potential customers (interested in buying the Cord Wrapper) visiting the vast number of

brick-and-mortar stores of Walmart *away from* the Cord Wrapper but severely damage the premium image and goodwill which had been established in connection with the Cord Wrapper.

199.    In addition, by creating the market price for the buyers within Walmart Retail, Evriholder effectively *eliminated* HHT's ability and opportunity to partner with Walmart with respect to selling HHT's Cord Wrapper in Walmart's thousands of brick-and-mortar stores across the U.S. as a result of Evriholder's deliberately predatory pricing model.

200.    As a result of these egregious infringement acts of Evriholder undoubtedly designed to suffocate and destroy Patent Owner HHT of the Cord Wrapper, HHT has suffered irreparable damages in at least the form of lost profits which otherwise HHT would have made – but for Evriholder's egregious infringement of the Asserted Patent – through HHT's partnering with Walmart in the form of offering the Cord Wrapper on the shelves inside brick-and-mortar stores of Walmart, the lost profits which are believed to be tremendous especially in view of the above-proven *inelastic* nature of the Cord Wrapper's premium pricing when the Cord Wrapper is offered in an impulse-stimulating setting such as the setting provided in a brick-and-mortar store of Walmart.

201.    Accordingly, Evriholder's acts of carrying out of its Utility Patent Infringement Actions has been deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate, the totality of which shall squarely render Evriholder's conduct to be the precise type of conduct egregious enough to warrant enhanced damages under 35 USC §284.

### SOLE COUNT

### (Infringement of The Asserted Patent)

202.    HHT incorporates the foregoing paragraphs as if fully set forth herein.

203.    Upon information and belief, Evriholder infringes claims 1-20 of the Asserted Patent under at least 35 U.S.C. § 271(a), (b), and (c).

204.    Upon information and belief, Evriholder's Cord Keeper includes each and every limitation of, and therefore infringes, apparatus claims 1-10 and 16-20 of the Asserted Patent, as set forth in detail in the infringement claim chart provided in Exhibit 2.

205.    Upon information and belief, Evriholder infringes method claims 11-15 of the Asserted Patent as Evriholder is, *in its Cord Keeper being used in a manner instructed or otherwise intended by Evriholder*, the single entity which either performs, or is attributable to with regard to the performing of, each and every step of method claims 11-15 of the Asserted Patent as set forth in detail in the infringement claim chart provided in Exhibit 2.

206.    Upon information and belief, Evriholder has directly infringed, and continue to infringe, apparatus claims 1-10 and 16-20 of the Asserted Patent in violation of 35 U.S.C § 271(a) through, without authorization, making, using, offering to sell, selling, or importing into the United States, its Cord Keeper.

207.    Upon information and belief, Evriholder has directly infringed, and continue to infringe, method claims 11-15 of the Asserted Patent in violation of 35 U.S.C § 271(a) through, without authorization, making, using, offering to sell, selling, or importing into the United States, its Cord Keeper such that Evriholder becomes the single entity which either performs, or is attributable to with regard to the performing of, each and every step of method claims 11-15 of the Asserted Patent as an unwary customer uses an item of Evriholder's Cord Keeper.

208.    Upon information and belief, Evriholder has committed affirmative acts of actively inducing others to directly infringe apparatus claims 1-10 and 16-20 of the Asserted Patent or cause method claims 11-15 of the Asserted Patent to be directly infringed, knowing and intending such affirmative acts will cause direct infringement of claims 1-20 of the Asserted Patent. Evriholder's such affirmative acts constitute *induced* infringement of the Asserted Patent in violation of 35 USC 271(b).

209.    To that end, knowing its Cord Keeper being an impulse-buy product, Evriholder, having expertise on selling impulse-buy products as being an impulse-buy products guru, has committed at least several affirmative acts to attract impulse purchases of its Cord Keeper from massive customers walking in the aisles of major brick-and-mortar retail stores. First, Evriholder has managed to place and display its Cord Keeper on the shelves inside brick-and-mortar retail stores of Walmart, while having known full well that (i) its Cord Keeper, in being a direct copycat product of the patented Cord Wrapper from the get-go, by definition infringes the Asserted Patent and (ii) such an affirmative act was a blatant knowing violation of the retailer agreement which it signed with Walmart as pertaining to the no-IP-infringement warranty requirement included therein. Second, Evriholder has provided instructions and enticing imagery on the packaging of its infringing Cord Keeper, instructions and imagery which collectively showcase the patented groundbreaking and unique advantages otherwise *exclusively* belonging to Plaintiff's patented Cord Wrapper per the patent protection therefor as afforded by the Asserted Patent. Third, Evriholder has set the in-store retail price of its infringing Cord Keeper offered for sale inside brick-and-mortar retail stores of Walmart exceedingly and predatorily low.

210.    Besides, Evriholder also sponsored, and continue to sponsor, online advertisements to promote its Cord Keeper offered on online platforms such as Walmart.com and Poshmark.com.

211.    All these affirmative acts of Evriholder have been committed to attract, with respect to its Cord Keeper, either impulse purchases from massive unwary in-store customers of Walmart or online purchases from ubiquitous unwary online customers, knowing and intending that these affirmative acts will cause direct infringement of claims 1-20 of the Asserted Patent.

212.    Upon information and belief, Evriholder's acts also constitute *contributory* infringement of the Asserted Patent specifically with respect to method claims 11-15 in violation of

35 USC 271(c). Evriholder contributorily infringes method claims 11-15 because, *inter alia*, Evriholder offers to sell and/or sells within the United States, and/or imports into the United States, its Cord Keeper, a product which, *inter alia*, (i) constitutes a material part of method claims 11-15 of the Asserted Patent, (ii) is not a staple article or commodity of commerce suitable for substantial non-infringing use, and (iii) are known by Evriholder to be especially made or especially adapted for use in an infringement of method claims 11-15 of the Asserted Patent.

213.    Evriholder's infringement of the Asserted Patent has been *willful and egregious* in nature in that its conduct of infringement has been wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or – indeed – characteristic of a pirate, the totality of which shall warrant enhanced damages against Evriholder under 35 USC §284.

214.    Because of Evriholder's egregious infringement of the Asserted Patent, HHT has suffered, and will continue to suffer, irreparable harm and injury, including monetary damages in an amount to be determined at trial.

215.    Upon information and belief, unless enjoined, Evriholder, and/or others acting on behalf of Evriholder, will continue their infringing acts, thereby causing additional irreparable injury to HHT for which there is no adequate remedy at law.

## **PRAYER FOR RELIEF**

216.    WHEREFORE, HHT respectfully prays for that this Court find in its favor and against Evriholder and that this Court grant HHT the following relief:

(i).    Pursuant to 35 U.S.C. § 271, a determination that Evriholder has infringed the Asserted Patent, and that Evriholder's infringement of the Asserted Patent was, and continues to be, willful;

(ii).    Pursuant to 35 U.S.C. § 283, an injunction enjoining Evriholder, its officers, agents, subsidiaries, and employees, and those in privity with or act in concert with any of the foregoing,

from further activities that constitute infringement of the Asserted Patent, including preliminary and permanent injunctive relief;

(iii).    Pursuant to 35 U.S.C. § 284, an award compensating HHT of damages *arising out of* Evriholder's infringement of the Asserted Patent and increasing the damages up to three times in view of the willful and egregious nature of the infringement, together with pre-judgment and post-judgment interest as well as costs against Evriholder;

(iv).    Pursuant to 35 U.S.C. § 285, a finding that this is an exceptional case, and award of reasonable attorneys' fees;

(v).    An accounting for acts of infringement;

(vi).    Such other and further relief as this Court may deem just and proper under the circumstance.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff HHT hereby demands a trial by jury of all issues so triable.

Dated: July 16, 2025              Respectfully submitted,

/s/ Jundong Ma
Jundong Ma (VA Bar No. 75143)
JDM Patent Law PLLC
5570 Sterrett Place, Suite 201
Columbia, MD 21044
Telephone: (703) 380-3874

*Counsel for Plaintiff Happy Hour Thinking, LLC*